## Marks' Appeal.

Argued October 21, 1940.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, RHODES and HIRT, JJ.

*William A. Gray,* with him *Wm. Abbott Witman, Jr.,* and *Lester J. Schaffer,* for appellant.

No appearance was made nor brief filed for appellee.

OPINION BY CUNNINGHAM, J., May 7, 1941:

The appellant, Fred Marks, appeals from an order of the Court of Quarter Sessions of Berks County adjudging him to be in contempt of court by reason of having conspired with one William Feinstein to evade and set aside an order of the court below, dated December 10, 1936, providing for the destruction of certain gambling machines which, after seizure and hearing, had been condemned and ordered destroyed. The sentence of the court was that Marks pay a fine of $300.

Pursuant to a petition filed by the district attorney, the court below entered its order for the confiscation

and destruction of the machines, directing that they be publicly destroyed by the sheriff, John C. Cook. On January 14, 1937, the sheriff made a return that "all of the gambling machines and devices received from the district attorney's office in accordance with the order of court, were publicly destroyed on December 29, and 30, 1936, by burning and the scrap sold for junk and Ten Dollars ($10) realized from said sale." Three years later, December 20, 1939, the court below entered an order for a rule upon Cook and the appellant, Marks, a county detective, to show cause why they should not be adjudged in contempt of court.

The order, after reciting the direction of December 10, 1936, for the destruction of the gambling devices and the sheriff's return thereto, continued: "In October, 1939, the president judge of this court received information from sources which appeared to be trustworthy that certain of the gambling machines or devices so ordered by this court to be destroyed, were not in fact destroyed but, on the contrary, were through the action and interference of Fred Marks, a county detective, surreptitiously, corruptly and unlawfully carried away and that said return to this court by John C. Cook, sheriff, was in fact false in that all the gambling machines or devices ordered by this court to be destroyed had not in fact been destroyed. Inquiry from Hertz Driv-Ur-Self System of Reading, Pennsylvania, brought the information that the truck used to carry the condemned gambling machines or devices had been rented by one William Feinstein; and further inquiry brought the information that William Feinstein was engaged in the business of dealing in certain gambling machines or devices." Cook filed an answer denying any knowledge of any falsity in his return, and averring that everything done by him "was done in the ordinary course of business" in his office. Subsequently, Cook was absolved of any "intentional wrongdoing".

The appellant, Marks, filed an answer to the court's

rule denying he interfered with the execution of the order for destruction of the gambling devices and raising two questions of law: (a) That under the provisions of Section 23 of the Act of June 16, 1836, P. L. 784, 17 PS §2041, he could not summarily be adjudged guilty of contempt on the basis of the facts alleged in the rule; and (b) the order for the rule to show cause disclosed on its face that the proceeding was barred by the statute of limitations. The quarter sessions, in an opinion filed March 18, 1940, held: (1) Appellant's alleged interference with its order for the destruction of gambling devices fell within the third paragraph of Section 23 of the Act of 1836 as misbehavior "in the [constructive] presence of the court, thereby obstructing the administration of justice"; and (2) the Act of March 31, 1860, P. L. 427, Section 77, 19 PS §211, limiting criminal prosecutions for misdemeanors to two years, did not apply to this contempt proceeding since it was allegedly committed in the technical presence of the court.

The provisions of Section 23 of the Act of 1836, under which the court proceeded, read:

"The power of the several courts of this Commonwealth to issue attachments and to inflict summary punishments for contempt of court shall be restricted to the following cases, to wit:

"1.   To the official misconduct of the officers of such courts respectively;

"2.   To disobedience or neglect by officers, parties, jurors or witnesses of or to the lawful process of the court;

"3.   To the misbehavior of any person in the presence of the court, thereby obstructing the administration of justice."

The theory adopted by the court in holding that the alleged contempt had been committed at least constructively "in the presence of the court" was thus elaborated in its opinion:

"Marks, although a county detective, was not an officer of the court; hence, the first section of the act can have no application. Nor is this proceeding grounded upon the provisions of the second section.

"But the facts charged, if true, fall within the provisions of the third section. The removal of the gambling machines from the custody of the law, resulting in the failure to carry out the court's order for their destruction, amounts to an act 'obstructing the administration of justice'. And said action charged was technically 'in the presence of the court'. The judge is not the court; he is but the presiding officer of the court. The sheriff is an officer of the court; in many court rooms there is a special seat of prominence set aside for that officer. He is the executive officer of the court and in executing the writs and orders issued by the court, he is acting for the court. Sales by him are judicial sales. So here the destruction of the gambling devices, being done upon order of the court, was in the course of a judicial proceeding. The sheriff in executing the decree of the court was acting for the court; the court acted in the matter through him and it may be said that in the execution of the order the court was at least constructively present at every stage of the proceedings."

The court then ordered a hearing upon the rule and answers. At the hearing three eyewitnesses of the destruction of the gambling devices testified, deputy sheriff Mabry, who had been ordered to take charge thereof by Cook, chief of county detectives Tulley, and appellant Marks.

In connection with the above quotation from the preliminary opinion of the court to the effect that the contempt was charged as having been committed in the actual presence of the sheriff, while representing the court, it should be noted that the sheriff was not present at the destruction of the machines, except through his deputy Mabry.

The testimony was conflicting with relation to the issue whether all of the confiscated machines had been destroyed. Certain trucks were used to transport them from the court house to a sand hole where at least all but two or three of them were burned. These trucks were rented by Feinstein. The destruction took place on two successive days—December 29 and 30, 1936. The only direct testimony against Marks was that of Mabry, the deputy sheriff. Referring to December 29th, this witness testified: "The second truck I helped to unload, I was standing at the tail gate helping to push them from the truck to the sand hole. There were two or three machines in the front of the truck; and Fred said, 'Never mind, I will take care of those.' Q. Fred who? A. Mr. Marks. He said, 'Never mind those. I will take care of those.' Q. They were unloaded? A. No, sir. Q. Were they destroyed in your presence? A. No, sir. Q. What kind of machines were they? A. They were either pin ball or slot machines. Q. How many were there? A. There were two or three. Q. Did you see the truck drive away? A. Yes, sir. Q. Were the machines on the truck when it drove away? A. They were."

Marks testified positively that every machine had been broken into pieces and destroyed "as far as the fire could destroy them." He also denied he had "any kind of arrangement in any way, shape, or form with Feinstein or anybody on his behalf having anything to do with the securing of [the] trucks or giving to him or anybody else any opportunity whatsoever to get any of [the] machines."

On the other hand, Tulley, a county detective, testified with reference to the same date: "Q. Were any machines of any kind left in that truck that day, or were they all taken out and destroyed? A. Absolutely there wasn't a machine in there. Everything that was on that truck was destroyed." The court below in the course of its opinion and findings upon the evidence

said Tulley's testimony was not convincing but prevented it from finding, beyond a reasonable doubt, "that one or more machines were in fact carried away and not destroyed." It, however, made the following finding:

"We think that the inference is both fair and plain that Marks connived with Feinstein to procure the truck and driver (for the Hertz Company furnished truck alone without a driver) in order to rescue at least Feinstein's own claw machine from destruction. Such connivance between Marks and Feinstein having for its purpose the nullification of an order of this court, constitutes in law an unlawful conspiracy."

It is not at all clear that the evidence supports the above inference of a conspiracy between Marks and Feinstein "to rescue at least Feinstein's own claw machine from destruction."

Both Tulley and Marks testified emphatically that all of the machines were destroyed. Mabry alone said that two or three *pinball or slot* machines were left on the truck the first day. Feinstein, who arranged for the trucks and originally paid the bill was shown to be a distributor for a type of machine known as a *claw* machine. The only evidence tending to support the court's finding that appellant and Feinstein conspired to prevent the destruction of one or more of the machines, is the following: Marks knew and was a friend of Feinstein for a year before the occurrence in question. About a year later, or in October of 1937, Marks paid a hotel bill of $197 for Feinstein at the Berkshire Hotel in Reading. Feinstein arranged and paid for the hiring of the trucks from the Hertz Driv-Ur-Self System which were used to haul the gambling machines from the court house to a sand pit near the Lancaster County line. Marks selected the place and directed the destruction of the machines.

Even if we accept the evidence, rejected by the court, that Marks directed the driver not to remove two or

three machines from the truck, these machines were pinball or slot machines, and not claw machines, the only type Feinstein handled. It seems to us the evidence raises no more than a suspicion of connivance and would not support a conviction on an indictment charging conspiracy.

Passing, for present purposes, the question of the sufficiency of the evidence to support an inference of the existence of a conspiracy to which appellant was a party, the significant feature of this case is that the court below concedes its inability to find from the testimony that the conspiracy was carried into execution. We, therefore, have a summary conviction for contempt based solely upon a conspiracy entered into approximately three years prior to any prosecution looking toward its punishment. We are not convinced the proceeding now under review should be sustained.

The right to punish for contempt is inherent in all courts, but the manner of its exercise is regulated by the Act of 1836, supra; *Snyder's Case*, 301 Pa. 276, 284, 152 A. 33, 76 A. L. R. 666; *Com. v. Sheasley et al.*, 102 Pa. Superior Ct. 384, 388, 157 A. 27; *Penn Anthracite Mining Co. v. Anthracite Miners of Pa.*, 114 Pa. Superior Ct. 7, 16, 174 A. 11.

Criminal contempts may be classified as "direct" or "indirect," according to whether they occur in the presence of the court (actual or constructive) or beyond that presence; *Penn Anthracite Mining Co. v. Anthracite Miners of Pa.*, supra. Contempts punishable by summary proceedings "must be limited to acts done in or so near the court as to interfere with its immediate business, like tampering with jurors during the trial, although not done in the face of the court," and in order to be punishable by a summary proceeding the act "must be done in the actual or constructive presence of the court, *otherwise it becomes a misdemeanor subject to indictment as such*": Snyder's Case, supra, at

page 286; *Penn Anthracite Mining Co. v. Anthracite Miners of Pa.,* supra, at page 16. (Italics supplied.)

Compare *Nye and Mayers v. United States,* 313 U. S. 33, 61 S. Ct. 810, 85 L. Ed. 733.

We think it clear that the conspiracy, if one was entered into, was not framed in the presence of the court, actual or constructive, and was, therefore, not punishable summarily.

Any conspiracy shown by the evidence in this case was at most an indirect contempt and in our opinion Section 77 of the Act of March 31, 1860, supra, limiting the time within which prosecutions for certain crimes may be brought, should be held applicable by analogy and as constituting an effectual bar to the present prosecution. As in force at the time this proceeding was instituted, it provided: "All indictments and prosecutions ...... for all misdemeanors ...... shall be brought or exhibited within two years next after such misdemeanor shall have been committed ......"

Where an act sought to be punished is a criminal contempt, the court may, by analogy, adopt the limitation prescribed by statute for criminal prosecutions: *Gompers v. United States,* 233 U. S. 604, 34 S. Ct. 693, 58 L. Ed. 1115; 13 Corpus Juris, page 61, Sec. 84; 17 C. J. S. pages 83, 84, Sec. 67.

In the Gompers case defendants were adjudged guilty of an indirect criminal contempt based on violations of the district court's injunction issued in a previous labor case (*Gompers v. Buck's Stove & Range Co.,* 221 U. S. 418, 31 S. Ct. 492, 55 L. Ed. 797) and sentenced to fine and imprisonment. The United States Supreme Court reversed the judgment on appeal, holding the Federal Statute of 1876, limiting criminal prosecutions to three years after the commission of the offense, applicable, if not literally, by analogy, to such a contempt proceeding.

Mr. Justice HOLMES, pointing out that a contempt pro-

ceeding is a "prosecution" within the federal statute, there stated (page 612) : "Indeed the punishment for these offenses peculiarly needs to be speedy if it is to occur ...... Even if the statute does not cover the case by its express words, as we think it does, still, in dealing with the punishment of crime a rule should be laid down, if not by congress by this court. The power to punish for contempt must have some limit in time, and in defining that limit we should have regard to what has been the policy of the law from the foundation of the government. By analogy, if not by enactment, the limit is three years."

The principle of the Gompers case was followed in *U. S. v. Goldman,* 277 U. S. 229, 48 S. Ct. 486, 72 L. Ed. 862, and *In re Jibb et al.,* 123 N. J. Eq. 251, 197 A. 12. In the latter case Justice BODINE of the Court of Errors and Appeals of New Jersey, held a proceeding for contempt, based on the making of a false affidavit in a chancery case, analogous to a criminal charge of perjury and barred by a two-year limitation applicable to such crimes. See also *T. F. Hart Investment Co. v. Great Eastern Oil Co.,* 27 F. Supp. 713, 715, 716; *U. S. v. Pendergast et al.,* 35 F. Supp. 593, 598.

Where an act sought to be punished as contempt also constitutes a crime, courts have frequently adopted by analogy the limitation prescribed by statute for criminal prosecutions: *Gordon v. Commonwealth,* 141 Ky. 461, 133 S. W. 206; *Goodall v. Superior Court in and for Santa Barbara County,* 174 P. 924, 926, 37 Cal. App. 723; *Beattie v. People,* 33 Ill. App. 651.

The second and third assignments of error are sustained.

Judgment reversed and appellant discharged.