Community Sports, Inc. *v.* Denver Ringsby Rockets, Inc., Appellant.

566

Argued January 3, 1968. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*David M. Kaufman,* with him *Gerald S. Lesher,* and *Baskin, Boreman, Sachs & Craig,* for appellant.

*Milton W. Lamproplos,* with him *Edward J. Greene, C. Kent May,* and *Eckert, Seamans & Cherin,* for appellee.

OPINION BY MR. JUSTICE ROBERTS, April 16, 1968:

This is an appeal from the grant of a preliminary injunction restraining defendant-appellant, Denver Rockets professional basketball team, from employing or using defendant, Larry Jones, as a professional basketball player during the 1967-1968 basketball season, and further restraining defendant Jones from playing professional basketball during said season for anyone other than plaintiff-appellee.

On September 28, 1966 Jones and one Wende, then general manager and president of the Wilkes-Barre Barons professional basketball team of the Eastern Professional Basketball League, entered into a written contract whereby Jones agreed to play basketball for the 1966-67 season for the Wilkes-Barre Barons exclusively.[1] The contract contained an option clause giving

---

[1] Because the Wilkes-Barre Barons sustained serious financial difficulties toward the end of the 1966-67 season, pursuant to league by-laws Wende turned his franchise over to the league which in turn sold the club to the present appellee, Community Sports, Inc. Although appellant argues that, for various reasons, appellee did not succeed to Wende's rights under the original contract between the Barons and Jones, given our decision to dissolve the injunction on other grounds we need not face the issue of succession of rights, and therefore assume, arguendo, that appellee did succeed to Wende's contractual rights vis-a-vis Jones.

the club the rights to Jones' services for an additional year (the 1967-68 season) provided said option was exercised by October 31, 1967. It is undisputed that this option was timely exercised. Nevertheless, on August 4, 1967, Jones signed a contract to play basketball during the 1967-68 season with the newly formed Denver Rockets of the American Basketball Association. Accordingly, Community Sports, Inc., now owners of the Wilkes-Barre franchise, commenced this action in equity.

In response to the chancellor's ex parte grant of a preliminary injunction, appellant filed a motion to strike service[2] and dismiss this injunction. In support of the motion to dismiss, appellant pleaded the existence of, and appended a copy of, a second agreement between Jones and Wende, also dated September 28, 1966 and referring to the basic contract signed that day, in which Wende specifically gave Jones the right to join any team in *another* league if Jones thought that by so doing he would have the opportunity to "better" himself. Appellant maintains that this document is part of the Jones-Wilkes-Barre Barons contract, and as such gives Jones an absolute right to "jump leagues" at any time during the duration of the agreement.[3] The court below, however, for several

---

[2] The motion to strike contested both the amendment of the complaint's caption and the manner in which appellant was served. For the same reason stated in footnote 1, however, we need not pass on the chancellor's decision to deny the motion to strike.

[3] The full text of this release is as follows: "September 28, 1966. To Larry R. Jones: Upon signing your contract for the Wilkes-Barre Barons of the Eastern Professional Basketball League for the 1966-1967 season, I, Joe Wende, President and General Manager of the Wilkes-Barre Barons agreed as follows: A.) If you, Larry Jones, have the opportunity to better yourself in another league such as the N.B.A. or etc. you are free to do so.    B.) If you go with another team in another league paragraph (a) and you are dropped from the team, you are to return to the Wilkes-

reasons refused to give effect to this agreement, in essence a release, and thus continued the preliminary injunction. Hence, this appeal.

We start with the proposition, now firmly established, that "on an appeal from a decree which refuses, grants or continues a preliminary injunction, we will look only to see if there were any apparently reasonable grounds for the action of the court below, and we will not further consider the merits of the case or pass upon the reasons for or against such action, unless it is plain that no such grounds existed or that the rules of law relied on are palpably wrong or clearly inapplicable:..." *Lindenfelser v. Lindenfelser,* 385 Pa. 342, 343-44, 123 A. 2d 626, 627 (1956); *United Natural Gas Co. v. Wagner,* 417 Pa. 456, 208 A. 2d 843 (1965); *Alabama Binder & Chemical Corp. v. Pennsylvania Industrial Chemical Corp.,* 410 Pa. 214, 189 A. 2d 180 (1963). Nevertheless, we believe that there were no grounds whatsoever upon which the chancellor could have reasonably refused to give effect to the plain meaning of the words of the document permitting Jones to better himself by joining another league, and for that reason hold that the preliminary injunction must be dissolved.

It is certainly not open to contention, nor did the chancellor so hold, that the two documents of September 28, 1966, both signed by Wende and Jones, could

---

Barre Barons of the Eastern League. C.) This agreement is to continue for the duration of your time under contract of the Wilkes-Barre Barons.

                    WILKES-BARRE BARONS, A Partnership
                    By Joe Wende /s/
                      (General Manager)

                        Larry Jones /s/
                        (Player)
                        109 N. Wells St., Kingston, Pa.
                        (Player's address)"

not in fact make a single contract, such that the terms of the written release are part and parcel of the Barons-Jones agreement. It is clear that the release if otherwise valid is just as much a part of the contract as are any of the terms embraced in the longer document signed the same day. In fact, the document containing the terms of the release specifically recites that it is executed "upon signing your [Jones'] contract for the Wilkes-Barre Barons . . . for the 1966-1967 season. . . ." Cf. Restatement, Contracts, §208(a); 4 Williston, Contracts, §581 (3d ed. 1961) (both texts deal with integration of several memoranda sufficient to satisfy the statute of frauds).

However, the chancellor refused to give effect to the release because he concluded (1) that it was not properly in evidence; (2) that Wende had no authority to execute it; (3) that Jones' subsequent re-affirmations of his employment with the Barons precluded any reliance upon the release; and (4) that Jones' agreement of July 5, 1967, whereby he agreed to pay appellee $1,500 as consideration for the latter's permission to let Jones join the Los Angeles Lakers of the National Basketball Association (assuming he made the team), shows that Jones himself did not consider the release worthy of enforcement. This Court, however, can find no record support for any of these conclusions.

How the court below determined that there was no evidence of the release remains a mystery to us. The release was clearly appended to appellant's motion to dismiss the preliminary injunction, yet the chancellor's opinion recites that "there is no evidence concerning this instrument." In a vain attempt to give content to this statement, appellee, in its brief, maintains that nothing was offered into evidence relative to this release. But this assertion overlooks the simple fact

that nothing was offered into evidence *at all,* for either side, except insofar as the various documents were appended to the pleadings. For this case was decided by the court below solely on the basis of a complaint and subsequent motion to dismiss the preliminary injunction. No testimony was taken, and no evidence formally introduced for either side. Furthermore, since no reply was filed by appellee to appellant's motion to dismiss the injunction, there is not even a *pleading* dispute as to the existence of the release. Therefore, if the chancellor's statement that there is no evidence concerning the release is based upon the fact that the release appeared only as an exhibit in a pleading, then, we must ask, how could there have been any evidence of the basic contract itself, for that too appeared only as an exhibit to a pleading? For purposes of deciding whether to grant the requested preliminary injunction, we hold that the release was properly before the court, it having never been alleged by either party, nor held by the chancellor, that the exhibit claimed to be a copy of the release was anything other than genuine.

The major agreement between Jones and the Wilkes-Barre Barons contained both the signatures of Joe Wende, general manager of the club, and also that of Harry Rudolph, president of the Eastern Basketball League. From this the chancellor concluded that the contract was really between Jones and the league, and that therefore Wende, the only signatory other than Jones himself to the release agreement, had no authority to grant Jones permission to "jump leagues." Support for this holding is allegedly derived from the constitution and by-laws of the league. But even a cursory examination of these by-laws and the contract reveals that the league is not a party to the Barons-Jones agreement, despite Rudolph's signature, and fur-

thermore that the league has only the most general supervisory powers over the contractual arrangements of its member clubs and their players. It is true that the parties agree to be bound by all league by-laws, and that they further agree to submit themselves to the discipline of league officials; but the actual by-laws cited by the chancellor as compelling the court's holding fall far short of supporting the proposition that only the league can release Jones from his contract. In fact, the by-laws relied upon by the court below speak merely to the right of the league to take over franchises which have failed financially.[4]  Although the Wilkes-Barre Barons have "gone under", and although that franchise was taken over by the league for the last three games of the 1966-67 season, and then sold by the league to appellee, it is undisputed that the release was signed by Wende long before he lost ownership of the Barons. It is a basic postulate of contract law that the league and/or appellee could succeed to no greater contractual rights over Larry Jones than those to which he and Wende agreed. Finally, one need look no further than the contract itself to see, in the clearest of language, the following:

"THE PARTIES HERETO FURTHER STIPULATE AND AGREE:

. . .

---

[4] The chancellor relied upon article I, §7 and article I, §8 of the league's by-laws. They provide: "7. He [the league president] may for reasonable cause forfeit or cancel the franchise of any Member Club and declare the Players frozen or free agents, provided however, that such action is ratified by three fourths vote of the members of the Board of Directors before it becomes effective. 8. He shall whenever in his judgment and with final approval of the Board of Governors act in the event of an emergency and have the lawful right and due authority to take over any Member Club . . . and manage said Club which is taken over for the best interest of the E.P.B.L. . . ."

"B. Although both player and club, signatories hereto, agree to be bound by the rules and regulations of the league, and submit disputes to the league for arbitration, it is specifically understood that *the league is not a party to this agreement. . . ."* (Emphasis supplied.)

Wende, therefore, had full and complete authority to permit Jones' withdrawal from the team if this young athlete felt able to better himself in another league.

The lower court next concluded that subsequent ratifications of the original contract by Jones somehow precludes him from now setting up the release. But what exactly were these subsequent ratifications? On June 15, 1967, in order to receive $345 in back wages, admittedly owing him by the Barons, Jones was required to sign a document presented to him by the league in which, inter alia, Jones warranted that he would honor "the contract now existing between him and the Wilkes-Barre Franchise," and further that he would not play basketball for anyone except the Barons unless the franchise owners gave him permission. By this agreement, we believe, Jones lost nothing. First, he merely agreed to honor the contract now existing, but this same contract also contained the release. Second, he agreed to play for no other club without receiving permission. Here again, since the new owners could succeed to no greater rights over Jones than those of Wende, this permission must be deemed to have already been given in advance by virtue of the Wende-Jones release, unless, of course, this June 15 document is really a new contract revoking the old one. But this cannot be so for the simple reason that in the same paragraph of the June 15 writing wherein Jones agreed to play for no one else, he did so "during the existence of his *present* contract with the Wilkes-

Barre franchise owners." (Emphasis supplied.)[5] Thus, *new* permission need have been given only for a switch of teams within the same league. For as to any "jump" of leagues, the original release was never suspended.

On June 26, 1967, Jones signed the following statement, written in at the bottom of his original contract: "Above contract is accepted by Larry Jones to inure to the benefit of Community Sports, Inc." Just as we discussed in the preceding paragraph, this amounts to nothing more than a ratification of the original contract—a contract embodying the release. Finally, on July 5, 1967, Jones signed an agreement whereby he contracted to pay appellee $1,500 in the event he should sign a contract with the Los Angeles Lakers of the National Basketball Association. A part of this document recited that "Larry Jones is presently under contract with Community Sports, Inc." Although it begins to sound like a worn out record we must again note that such a document merely ratifies the original contract, release and all.

---

[5] There would be, in addition, another significant problem which would arise should an attempt be made to construe the June 15 writing as a separate contract of employment, revoking the original one of September 28, 1966. On the very face of this June 15 document it appears that the consideration for Jones' promise to play for no one other than the Barons, except upon approval of the owners, is merely the payment of $345 to Jones, which is *already* owed him under the September 28, 1966 contract. Although the rule in Pennsylvania is that lack of consideration will not preclude enforcement of a contract under seal, *Brereton Estate*, 388 Pa. 206, 130 A. 2d 453 (1957) ; *Barnhart v. Barnhart*, 376 Pa. 44, 101 A. 2d 904 (1954), this rule does not apply in a court of equity where extraordinary relief such as this is sought. *Markson Bros. v. Redick*, 164 Pa. Superior Ct. 499, 66 A. 2d 218 (1949) ; *Renaire Corp. v. Butler*, 72 Montg. L.R. 385 (C.P. 1956) ; Restatement, Contracts, §366. Under such circumstances, the court is bound by the common law rule that past consideration is insufficient. *Erny v. Sauer*, 234 Pa. 330, 83 Atl. 205 (1912) ; *Wimer v. Overseers of the Poor of Worth Twp.*, 104 Pa. 317, 320 (1883).

It is this July 5, 1967 agreement that prompted the chancellor to conclude that Jones himself acknowledged that he could not enforce the original release. But this conclusion can only be reached by grafting onto the principles of equity the notion that "two wrongs *do* make a right." Admittedly, by this agreement, Jones bound himself to pay appellee for a release to the Lakers; but how can this be said to vitiate completely a prior, otherwise valid carte blanche release? The simple truth is that Jones did not have to sign this document at all if he wished to play for the Lakers. Of course, having now signed it, a contract under seal, he would be bound to pay $1,500 to appellee if he should join the *Los Angeles* team.[6] But this in no way means that Jones may not still rely upon the original release to sustain his right to play for Denver. Most likely, without legal advice, and faced with the complexities of his contract being shunted about from Wende to the league and then to appellee, Jones may not have realized that he could have left the Barons without paying for this privilege. However, when, a month later, he began negotiating with Denver, Jones was no doubt told by that club that he did not need the specific permission of appellee to leave the Barons. This, we believe, was correct advice.

For all the foregoing reasons, we conclude that the court below had no grounds upon which to grant the preliminary injunction, and that therefore the decree of the court below must be reversed.[7]

---

[6] We point out, however, that, given the prior release of September 28, 1966, appellee has actually given no new consideration for Jones' promise to pay $1,500 should he join the Lakers. Therefore, the same problem discussed in the preceding footnote would arise if appellee ever attempted to enforce the Lakers' release in equity.

[7] Though the period covered by the injunction will have run by the time this opinion is filed, the controversy still is not moot.

576

Decree reversed. The preliminary injunction is dissolved. Each party to pay own costs.

For, were this injunction to stand, Jones could be adjudged in contempt of court for his willful refusal to follow the court's decree, despite the fact that the conduct resulting in the contempt has ended. See *In Re Order for Destruction of Gambling Devices*, 32 Berks 193 (C.P. 1940), rev'd sub nom on other grounds, 144 Pa. Superior Ct. 556, 20 A. 2d 242 (1941) (contempt proceeding must fall within the relevant statute of limitations if the act constituting contempt also is a crime).