Barnhart, Appellant, *v.* Barnhart, Appellant.

Argued October 5, 1953. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*H. Russell Stahlman,* with him *Victor E. Riva,* for plaintiffs.

*Stephen D. Marriner,* with him *Rufus S. Marriner* and *Marriner, Wiley & Marriner,* for defendants, appellants.

*Ralph W. Peacock,* for defendants, appellees.

OPINION BY MR. JUSTICE ALLEN M. STEARNE, January 4, 1954:

The two questions presented by these appeals in a partition proceeding are (1) whether or not papers executed by an heir constitute a conveyance of his interest in named real estate and (2) whether or not a husband of an heir has released his interest in his deceased wife's estate. The court below decided that the heir had conveyed his interest in the real estate, but that the husband of the deceased wife had not released his interest in her estate. The appeals followed.

Robert L. Barnhart died intestate May 20, 1924, seized of real estate in Charleroi, Washington County, described in the complaint, which for the present purposes may be termed the "theater" property on McKean Avenue and the "Fourth Street" real estate.

(The *questioned conveyance* relates solely to the theater property while the possible *interest of the spouse of the deceased heir* concerns both pieces of real estate). Surviving intestate was his widow, Fannie Barnhart, three children, Harry L. Barnhart (whose conveyance is in issue), Fannie G. Keaser and Lillian B. Horne (who later intermarried with Eldred B. Orndorff, whose release is in issue) and a granddaughter, Nellie Teegardner, child of a predeceased daughter, Nellie Barnhart Lindauer.

Harry L. Barnhart died intestate January 14, 1943, survived by his widow, Nellie Barnhart, and one child, Harry F. Barnhart.

Lillian B. Orndorff died intestate February 1, 1949, leaving to survive her a husband, Eldred B. Orndorff, and Dorothy Mae Mollenauer, a child by a previous marriage.

The findings of fact of the court below established that by a writing dated June 2, 1930, Harry L. Barnhart executed and delivered a paper titled "agreement" reading: "To the Members of the Palace Theater—This is to certify that on and after June 14, 1930 I will no longer remain a member of said firm. In consideration of $20,000.00 cash payment I surrender all right, title and interest in the above mentioned theater".

There is a finding of fact that Harry L. Barnhart received $20,000, the consideration money therein mentioned.

On June 16, 1930, Harry L. Barnhart executed and delivered another paper titled "agreement" providing: "In consideration of the sum of $1.00, I hereby dispose of my interest in the Palace Theater property to the following Robert L. Barnhart Heirs; Mrs. Fannie Barnhart; Mrs. J. L. Keaser; Lillian Barnhart and Nellie Lindauer".

On May 28, 1931, Harry L. Barnhart and his wife executed and delivered another paper titled "agreement" reading: "That I, Harry L. Barnhart . . . in consideration of the sum of $1.00 . . . do grant, bargain, sell, release and confirm unto the said Mrs. Fannie Barnhart, Mrs. Fannie G. Keaser, Mrs. Lillian Barnhart Horne and Miss Nellie B. Lindauer . . . :

"My entire interest in the property, business, and good will as a going concern of the Palace Theater . . . including all assets and property of any kind or nature whatsoever belonging or appertaining to said business.

"The purchasers to be entitled to all income present and future.

"To Have and To Hold all and singular of said goods and chattels to the said Mrs. Fannie Barnhart, Mrs. Fannie G. Keaser, Mrs. Lillian Barnhart Horne and Mrs. Nellie B. Lindauer, their executors, administrators and assigns, for their own use and behoof forever.

"And I, the said Harry L. Barnhart my heirs, executors, administrators, give the bargained property unto the said Mrs. Fannie Barnhart, Mrs. Fannie G. Keaser, Mrs. Lillian B. Horne and Miss Nellie B. Lindauer, their executors, administrators and assigns, for and against all person or persons whomsoever shall and will warrant and forever defend by these presents".

We cannot profitably add anything to the accurate and comprehensive opinion of the learned Chancellor construing these documents. We agree that by their terms Harry L. Barnhart effectively conveyed and transferred his interest in the theater property, which included both real estate and personal property used in connection with the conduct of the theater. Even though the language of the documents be regarded as

equivocal—which we do not—the evidence is overwhelming that Harry L. Barnhart in his lifetime and his widow and son after his decease, construed the language to be an absolute conveyance and transfer of his interest in both real and personal property of the theater and of its business. Nellie Barnhart, the widow, and Harry F. Barnhart, the son of intestate Harry L. Barnhart, possess no interest in such real estate.

Coming now to a consideration of the nature of the document executed by the spouse of the deceased wife-heir prior to their marriage, the learned Chancellor said in his adjudication: "The Court is strongly of the opinion that [the document] at most is a release in futuro and that the same was executed without any valid consideration". . . . We agree that the document was a release, but disagree that it was "without any valid consideration". What we are required to determine is whether or not such release is effective after the marriage and the subsequent death of the wife.

The document in question reads:

"I, Eldred Orndorff of Charleroi, Pennsylvania, in contemplation of marriage to Mrs. Lillian Horne of 410-4th Street, Charleroi, Pennsylvania, and in consideration of the rights of her daughter, Dorothy Horne, do declare that I hereby relinquish and waive forever any and all rights and claims that I may hereafter have under statutory law or otherwise in and to the property or estate of the said Lillian Horne, whether real or personal.

"In witness whereof, I hereunto affix my hand and seal in the presence of witnesses this eighth day of April, in the year Nineteen Hundred Forty-three.

"Eldred Brady Orndorff (Seal)

"Witness:

Byron A. Stump, 4256 Colonial Park Drive, Pittsburgh, Pa.

Grace Z. Stump, 4256 Colonial Park Dr., Pgh., Pa."

The witnesses Byron A. and Grace Z. Stump are husband and wife. Mrs. Stump was a cousin of Mrs. Orndorff (formerly Mrs. Horne). Mr. Stump was the scrivener. The circumstances surrounding the execution of the release was testified to by Mr. Stump and which was corroborated by his wife, as follows: "Q. And you were present when all of these signatures were affixed to this paper? A. I was present when those were affixed. Q. On April 8, 1943, which is the date of this document, when did you first see Mr. Orndorff and Mrs. Horne? A. When I arrived home from work. Q. Will you describe to us what occurred? A. They were sitting in the living room as I went in and after the usual pleasantries of meeting someone, they started discussing a proposed marriage between the two of them, and Mrs. Horne stated that she would under no circumstances marry Mr. Orndorff unless there was a paper drawn whereby he would relinquish any right to sharing in her estate because she had a daughter, Dorothy Horne, that she wanted any estate that she might have in its entirety to go to her. Q. What was Mr. Orndorff's comment upon that, Mr. Stump? A. Mr. Orndorff's comment upon that was that he was not interested in her estate, that he agreed that Dorothy Horne should have any interest in her estate, if anything should happen to her, that he was not interested in her estate or any part of it. Q. What did they want you to do? A. They wanted me to write an agreement that in the event of her death after her marriage to Mr. Orndorff, he would not share in any part of her estate. Q. And what was your reaction to that request? A. My reaction was that I was a business man, not a lawyer, and if they wanted any such thing drawn, they should go to a lawyer, that they should get a lawyer to draw any

paper that would be binding on both parties. Q. How long did you discuss this? A. I would judge over a period of two hours. Q. And finally, what occurred? A. Finally, they kept asking and one or the other asked me—I think it was Mrs. Horne—'Well, don't you have a typewriter in the house?' I said, 'Yes, I have a typewriter.' 'Well, you are a business man; you have seen lots of agreements. Could you not draw up such an agreement?' Well, after being prevailed upon for two hours, I finally said, 'Well, I will be glad to do the best I can to draw up such an agreement.' Q. And this Exhibit No. 3 is the agreement— A. It is the agreement that I drew up and typed." He also testified: "Q. Was there any comment by either party upon their willingness or nonwillingness to sign such an agreement? A. As a matter of fact, Mr. Orndorff indicated that he was willing to sign any agreement or paper which would provide that he did not expect or did not want or had no interest in any property or any estate that Mrs. Horne may leave after their marriage. Q. Was there any objection by either of the parties to this agreement? A. None whatsoever. Q. Was there any pressure upon either party to sign this agreement, of any sort? A. None whatsoever, except that Mrs. Horne insisted that she would not marry Mr. Orndorff unless he relinquished his right to her estate, if you can call that pressure, then my answer would be—Q. Was Mr. Orndorff in full possession of his faculties as far as you observed? A. Yes, undoubtedly."

There was no question raised concerning the execution of the document or the credibility of this testimony.

At the date of execution of this document, April 8, 1943, it was testified that Mr. Orndorff was aged thirty-seven years and Mrs. Horne forty-four or forty-

five. The marriage took place on April 14, 1943. Mr. Orndorff apparently had not been married before, while Mrs. Orndorff had been previously married and divorced, and had a daughter by that marriage, Dorothy Mae Mollenauer, a party to this proceeding. Mrs. Orndorff died intestate February 1, 1949, survived by her husband and daughter.

At the date of the marriage Mr. Orndorff was in active military service, home on furlough, and continued in the service until January 1, 1946, when he was discharged because of physical disability.

While there was testimony seeking to establish that Eldred Orndorff for one year or upwards previous to the death of his wife had wilfully neglected or refused to provide for her and had for such period wilfully and maliciously deserted her, the testimony was clearly insufficient for such purpose. It did not establish, *for that reason,* the husband had forfeited his interest in his wife's estate. The evidence did not affirmatively show that there had been a full and fair disclosure of the extent and value of his proposed wife's property and of her financial worth, prior to the husband's execution of the release. It is likewise evident that there existed no evidence of actual fraud or purposeful concealment. The problem is therefore reduced to a question of law, viz.: the effect of a release by a husband of his interest in his wife's estate under the above circumstances.

Counsel for the husband in his excellent brief states: "An exhaustive search of the decisions of the appellate courts of Pennsylvania treating on the subject of prenuptial agreements does not reveal a single decision where the Court had before it a written unilateral agreement, which is the situation in the case at bar." Our research confirms this statement.

There, however, appears to be a marked difference between the nature of an antenuptial *agreement* and a *release*. An antenuptial settlement is a *contract* which is entered into before, but in contemplation and generally in consideration of marriage, and involves property or property rights and interests of the prospective husband and wife or both. In order for such an agreement to be valid it must be entered into freely, understandingly and without fraud by persons legally competent to contract, and its provisions must be just and reasonable. It requires the utmost good faith and a high degree of fairness. See 41 C. J. S. Husband and Wife secs. 79-80 and the numerous cases cited.

In most cases of antenuptial agreements the parties to the contract are ordinarily concerned with the wife's future security and financial protection, and generally relate to second or multiple marriages. A majority of cases litigated are instances where the wife alleges that she has been deceived concerning the extent of her husband's resources. This Court has consistently decided that the validity of such agreements requires the utmost of good faith between the parties, a reasonable provision made, *or a full and fair disclosure of worth.* Among the numerous cases see: *Groff's Estate,* 341 Pa. 105, 19 A. 2d 107; *McClellan Estate,* 365 Pa. 401, 75 A. 2d 595; *Snyder Estate,* 375 Pa. 185, 100 A. 2d 67. Such contracts are ordinarily executed by both parties. They are intended to be effective at the date of decease. Until such event occurs the contract constitutes but unexecuted mutual covenants.

Contradistinguished from a prenuptial agreement is *a release by a husband of his rights in the wife's property.* Such release is effective *in praesenti* releasing rights which may arise *in futuro* upon the decease of the wife. Such a release, in the absence of fraud is valid: 41 C. J. S. Husband and Wife sec. 98 *Mc-*

*Cready's Estate,* 316 Pa. 246, 175 A. 554, was a case of an antenuptial agreement where, it is true, the husband declared that he had full knowledge of the extent of his wife's estate. We said, speaking through Justice SIMPSON (p. 253) : ". . . In some respects, every contest in this class of agreements is unique. In each, all of the relevant facts must be grouped together, and, when considered in bulk, the court must determine whether or not the party objecting has a just right to complain.

" 'Antenuptial contracts are not inherently fraudulent, nor is there any such presumption. They require good faith, but fraud is not presumed in them any more than in other cases. There must be some evidence of gross disproportion or other fact from which fraud may be inferred before the onus changes': Robinson's Estate, 222 Pa. 113, 115." And p. 255:

"If there was no evidence of what took place at the execution of the agreement which the appellant seeks to have set aside, it is presumed there was no designed concealment or imposition: Whitmer's Estate, 224 Pa. 413. Here, there is undisputed evidence of what took place, and it excludes all possibility of designed concealment or imposition on the part of testatrix. Appellant's signature to the agreement, which stated that he knew its contents, is affirmative proof that he was not deceived when he signed it: Smith's Appeal, 115 Pa. 319, 321.

"If one who signs a paper can read and write, and is under no duress when he or she signs it, 'the law presumes that, under such circumstances, [it is signed] with full knowledge of its contents': Birkbeck's Estate, 215 Pa. 323, 325.

"The principles set forth in the authorities above quoted, each and all tell against appellant's contention. It is clear from the evidence that appellant knew

exactly what he was doing when he signed the antenuptial agreement; that he knew his intended wife was a woman of large means, though he may not have known of exactly what her estate consisted; that he expected to live at her home after they were married and wholly at her expense; he admits that during the nine and a half years of their married life 'she paid everything,' and this included not only their living expenses with all the accessories which her means permitted, but included also the expenses of the numerous and extended trips they took in this country and abroad; and that, in addition thereto, she gave him large sums of money for his own use.

"It is clear to us, as it was to the court below, that appellant 'offered no evidence to indicate that there was any actual fraud committed in the procurement of the agreement';"

The testimony in the present case clearly reveals that Eldred Orndorff at and prior to the date of the release was acquainted with the fact that his proposed wife was a woman of substantial means, even though he did not know and was not told the extent or value of her property. At the time of the making and execution of the release his proposed wife informed him that she would not marry him unless he agreed to relinquish all rights in her estate in order that her daughter by her former marriage might inherit her entire estate. Mr. Orndorff acquiesced and stated that he was not interested in Mrs. Horne's (later Mrs. Orndorff's) estate or any part of it and agreed that on her death the entire estate should pass to the daughter. It is plain that when Eldred Orndorff executed the release he knew exactly what he was doing and intended to execute the release according to its terms.

The contention is untenable that the release was without consideration. The document is under seal. The seal imports consideration. *Want* of consideration, distinguished from *failure* of consideration, does not constitute a defense: *Conrad's Estate,* 333 Pa. 561, 3 A. 2d 697; *Rynier Estate,* 347 Pa. 471, 473, 32 A. 2d 736; *Billings v. Roth,* 156 Pa. Superior Ct. 390, 40 A. 2d 910; *Peoples Pittsburgh Trust Co. v. Barth,* 161 Pa. Superior Ct. 72, 53 A. 2d 845. See also: Vol. One, Williston on Contracts (Revised Edition) sec. 109 p. 373.

There is not the slightest contention or proof that Mr. Orndorff was unaware of the nature of his act in executing the release and the effect thereof, or that any fraud or concealment was practiced upon him. The wife fulfilled the terms of the condition by marrying him. Such release is valid. Though *in praesenti* it releases and discharges interests which may arise *in futuro*: *Caplan v. Pittsburgh,* 375 Pa. 268, 100 A. 2d 380. Eldred B. Orndorff having effectively released his interest in the estate of his deceased wife, Lillian Horne Orndorff, he possesses no title to any of the real estate described in these partition proceedings.

The appeals of Nellie Barnhart, No. 198, and Harry F. Barnhart, No. 199, are dismissed and the decree, insofar as they are concerned, is affirmed, at their respective costs. The appeals of Dorothy Mae Horne Mollenauer, No. 180, and Fannie Barnhart, No. 181, are sustained and the decree, insofar as they are concerned, is reversed at the cost of the appellee, Eldred B. Orndorff. The record is remanded to the court below with direction to enter an appropriate decree in accordance with this opinion.