533 A.2d 423

**In re ESTATE OF George W. GEYER, Deceased.**

**Appeal of Rosalie S. GEYER, Widow.**

Supreme Court of Pennsylvania.

Argued June 3, 1986.

Decided Oct. 15, 1987.

494

Thomas J. Finucane, Chambersburg, for appellant.

Joseph Roda, Lancaster, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

McDERMOTT,[1] Justice.

The controversy in this appeal centers on whether an antenuptial agreement between the appellant, Rosalie Geyer, nee Werner, and her deceased husband, George W. Geyer, precludes her from exercising her statutory right to take against his will.[2]

The appellant and the decedent met in October, 1976. Each had been twice married and widowed. A whirlwind romance ensued. Mr. Geyer soon expressed his interest in marriage, but the appellant was reluctant to marry a third time. Nevertheless she eventually consented to the union and the couple married on January 9, 1977.

In January of 1977, George Geyer was 68 years old. He had one adult son residing in California, five grandchildren, and six great grandchildren. By all accounts Mr. Geyer was an astute businessman who successfully operated and expanded the family enterprises. His net estate at the time of his marriage to Rosalie Werner was approximately 594,-000 dollars. A substantial portion of this wealth was composed of the family business, but the decedent also had extensive real estate holdings.[3] He was established in the community and enjoyed a comfortable lifestyle.

Rosalie Werner, 56 at the time of her third marriage, had three adult children from her first marriage. Her second

---

1. This case was reassigned to this author.

2. Act of April 18, 1978, P.L. 42, No. 23, § 3, *as amended,* July 11, 1980, P.L. 565, No. 118, § 2, 20 Pa.C.S. § 2203.

3. Seventeen parcels including his home.

husband died in March, 1976. After selling their marital home in Illinois she moved to Pennsylvania in order to be nearer her sister. Thus when she met George Geyer in October, 1976, she was relatively new to the locale, having resided there only since the previous August. Though she possessed no substantial business experience the appellant realized a modest income from her skills as a pianist.[4] Additionally, she received a Navy pension as a result of her second husband's military service.[5] Rosalie Werner's net estate was worth approximately 39,000 dollars in January of 1977.

From these respective positions the parties entered the antenuptial agreement here at issue. That agreement provided:

ANTE–NUPTIAL AGREEMENT

MADE this *30th* day of *December*, in the year nineteen hundred and seventy-*six* (1976):

BETWEEN George W. Geyer, of the Borough of Chambersburg, Franklin County, Pennsylvania, FIRST PARTY,

AND

ROSALIE WERNER, of Greene Township, Franklin County, Pennsylvania, SECOND PARTY.

WHEREAS, the said parties contemplate entering into marital relations with each other and each of the parties has been previously married;

WHEREAS, the first party is possessed of real and personal property, and the ownership and operation of Geyer Lumber & Millwork Co., Inc., the fuel oil business, and Geyer's Kraft Korner, Inc.;

WHEREAS, the first party has a son, George W. Geyer, III, five grandchildren, and six great grandchildren;

4. The appellant earned $108.00 per week as a piano player in a local restaurant. She also made $75.00 per week as a piano teacher.

5. This pension featured cost of living adjustments. It terminated upon the appellant's marriage to Mr. Geyer at which time it paid $125.00 per month.

WHEREAS, the second party's heirs are three children and ____ grandchildren; and

AND WHEREAS, the parties hereto, both having full knowledge and understanding of the other party's financial worth and financial position, agree with the other that their existing legal rights or the existing legal rights of their children and heirs shall not be affected by the proposed marriage as herein stated:

NOW, THEREFORE, it is mutually agreed as follows:

1. That the first party shall, during the continuance of his marriage with the second party, provide a home for the second party and shall use his income to provide reasonable support, maintenance and medical expenses for the second party, and upon the death of the first party if the second party survives him, then the first will either devise or convey to the second party the residence property, free and clear of all encumbrances, including the household furniture and furnishings less certain items which will be designated for his child or grandchildren.

2. That upon the death of the first party, the second party surviving him and living with him at the said time as his wife, shall be awarded, given or bequeathed a sum of Twenty Thousand ($20,000.00) Dollars to provide a substantial contribution to her way of living.

3. That the first party agrees with the second party and the second party agrees with the first party that in consideration of the two previous provisions by the first party, the second party will not make any claim to or file an election to any other portion of the first party's estate.

4. That the first party, in consideration of these agreements, understands and agrees that the second party may dispose of her estate in any way she wishes to do so, either by gift, devise or by will.

5. That it is expressly agreed that by virtue of the said marriage, neither party hereto shall have or acquire any right, title or claim in or to the real or personal estate of the other, except as herein provided, and the estate of each shall descend to and vest in his or her heirs-at-law,

legatees or devisees as may be prescribed by his or her last will and testament.

6. That it is expressly agreed that if either party shall mortgage, sell or convey his or her real estate, the other party hereto shall upon request join in any and every mortgage, deed, or other instrument that may be necessary for the eventual transfer of the same.

7. That this agreement is entered into by each party with full knowledge on the part of each of the extent and probable value of all of the property, or estate, of the other, and of all the rights, that but for this agreement, would be conferred by law upon each of them in the property, or estate, of the other, by virtue of the consummation of the said proposed marriage; and it is the express intention and desire of the parties hereto that their respective rights in and to each other's property, or estate, of whatsoever character the same may be, shall be determined and fixed by this agreement, and not otherwise.

8. That this agreement shall bind the parties hereto, their heirs, executors and assigns.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals, the day and year first above written.

WITNESS: _____ _____ [6]

/s/George W. Geyer (SEAL)

George W. Geyer

    FIRST PARTY

/s/Rosalie Werner (SEAL)

Rosalie Werner

    SECOND PARTY

The decedent passed away on May 1, 1982, some five years after his marriage to the appellant. A will dated July 13, 1981, was offered for probate, the provisions of which are set forth below.

---

**6.** This document was not witnessed, though the Orphans' Court determined that it was executed sometime between December 28, 1976, and April 4, 1977.

I, George W. Geyer, of the Borough of Chambersburg, Franklin County, Pennsylvania, being of sound mind, memory and understanding do make, publish and declare this as and for my last will and testament, hereby specifically revoking any prior will made by me.

FIRST.  I direct that all my just debts and funeral expenses be paid as soon as practicable after my death.  I direct that all estate and inheritance taxes shall be paid by my Executor out of my estate.

SECOND.  I give, devise and bequeath my home residence at 542 Guilford Avenue, Chambersburg, Pennsylvania, and the sum of Twenty Thousand ($20,000.00) Dollars, to my wife, Rosalie S. Geyer in accordance with the terms of our anti-nuptial [sic] agreement dated December 30, 1976.

THIRD.  I give, devise and bequeath all of the rest, residue and remainder of my estate, whatsoever and wheresoever situate, to my son, George W. Geyer, III, absolutely, if he is living at the time of my death.

FOURTH.  If my son, George W. Geyer, III, is not living at the time of my death, then I give, devise and bequeath all of the rest, residue and remainder of my estate, whatsoever and wheresoever situate, to the children of my son, George W. Geyer, III, in equal shares.

FIFTH.  If any person inherits an interest in my estate before reaching the age of twenty-one (21) years, then for such person's estate I appoint Farmers and Merchants Trust Company of Chambersburg, Chambersburg, Pennsylvania, as guardian.  The guardian shall pay the net income and as much of the principal as in its sole judgment is reasonable and necessary for the proper maintenance and support of any minor child, as an addition to its parental support, and the guardian shall have wide discretionary powers as to investments.

SIXTH.  I also authorize my Executor herein named to operate my business until such time as it can be liquidated or disposed of.

SEVENTH. I nominate, constitute and appoint my son, George W. Geyer, III, as Executor of this my last will and testament, without bond, but if he should predecease me or fail to qualify, I then nominate, constitute and appoint Farmers and Merchants Trust Company of Chambersburg, Chambersburg, Pennsylvania, as Executor in his place.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 13th day of July, A.D., 1981.

/s/ George W. Geyer (Seal)

George W. Geyer

This document was self-proving.

As the surviving spouse Mrs. Geyer elected to take her statutory share of her late husband's estate. 20 Pa.C.S. § 2203. The executor asserted the antenuptial agreement referred to in the will as a bar to the appellant's statutory election.

After hearings the Orphans' Court allowed the appellant her election; concluding that the agreement was invalid, and that even if valid it had been breached. On appeal the Superior Court reversed.[7] Upon request we granted allocatur.

The leading decision in this Commonwealth concerning the interpretation of antenuptial agreements is *In re Hillegass Estate,* 431 Pa. 144, 244 A.2d 672 (1968). In that case the Court attempted to curb the confusion created by prior characterizations of antenuptial agreements, and expressly set forth basic standards of conduct applicable to the parties and to the agreements themselves.

In the field of Antenuptial Agreements, the pertinent law has been differently and varyingly expressed in a number of cases, with the result that in several respects the law is not as clear, definite and certain as it should be. We shall therefore eliminate the confusion and conflicts resulting from different expressions of the applicable standards and principles by stating clearly and more

7. *In re Estate of George W. Geyer,* 338 Pa.Super. 157, 487 A.2d 901 (1985).

definitely the applicable standards and principles in this field.

Parties to an Antenuptial Agreement providing for the disposition of their respective estates do not deal at arm's length, but stand in a relation of mutual confidence and trust that calls for the highest degree of good faith and a reasonable provision for the surviving spouse, *or* in the absence of such a provision a full and fair disclosure of all pertinent facts and circumstances.

*Id.*, 431 Pa. at 149, 244 A.2d at 675 (footnotes and citations omitted, emphasis in original).[8]

After announcing these standards the Court set forth the following principles.

(1) An Antenuptial Agreement is presumptively valid and binding upon the parties thereto.

(2) *The person seeking to nullify* or avoid or circumvent the Agreement has the burden of proving the invalidity of the Agreement by clear and convincing evidence that the deceased spouse at the time of the Agreement made *neither* (a) *a reasonable provision for the intended spouse, nor* (b) *a full and fair disclosure* of his (or her) worth.

(3) In evaluating the reasonableness of the provision for the survivor, such reasonableness must be determined *as of the time of the Agreement* and not by hindsight. *Reasonableness* will depend upon the totality of all the facts and circumstance *at the time of the Agreement,* including (a) the financial worth of the intended husband; (b) the financial status of the intended wife; (c) the age of the parties; (d) the number of children each has; (e) the intelligence of the parties; (f) whether the survivor aided in the accumulation of the wealth of the deceased spouse; and (g) the standard of living which the survivor had before marriage and could reasonably expect to have during marriage.

---

**8.** The basic dictates of *In re Hillegass Estate,* 431 Pa. 144, 244 A.2d 672 (1968), are gender neutral and, therefore, do not run afoul of this Commonwealth's equal rights amendment. Pa. Const. Art. 1, § 28.

(4) Full and fair disclosure does not require the disclosure of the *exact* amount of his or her property.

(5) Even where there is a valid Antenuptial Agreement, this does not prohibit subsequent inter vivos gifts and testamentary bequests to a surviving spouse.

*Id.,* 431 Pa. at 150–151, 244 A.2d 675–676 (emphasis in original, citations omitted).

■ The burden in this case was on Mrs. Geyer to demonstrate by clear and convincing evidence that the agreement did not make reasonable provision for her, *and* that it was entered into without full and fair disclosure by the decedent.[9] We will consider these requirements in reverse order.

■ The law is well settled that disclosure between parties need not be exact. Nevertheless disclosure must be "full and fair". *Kaufmann Estate,* 404 Pa. 131, 136 n. 8, 171 A.2d 48, 51 n. 8 (1961). Disclosure may be imprecise only to the extent that it does not obscure the general financial resources of the parties. Compare *Kaufmann Estate, id.* (Agreement stating husband's worth was "in excess of ten million dollars" was considered full and fair disclosure of estate actually valued at ten and one-half million dollars). Of course, whether adequate disclosure has been made will depend upon the facts and circumstances of the particular situation.

■ In determining that the appellant entered this agreement with full and fair knowledge of George Geyer's financial position the Superior Court relied heavily upon the fact that the agreement itself recites as much, and that Mrs. Geyer was cognizant of George Geyer's comfortable lifestyle and financial interests in the Geyer Lumber and Millwork Company as well as a fuel oil business.

**9.** We note that the Superior Court read *Hillegass* as requiring an antenuptial agreement to make reasonable provision *and* to be the entered into after full and fair disclosure. This was a misreading of *Hillegass* which provides that an agreement can survive if *either* (but not necessarily both) of these requirements is satisifed. *See In re Estate of Kester,* 486 Pa. 349, 353 n. 4, 405 A.2d 1244, 1246 n. 4 (1979).

However, the Orphans' Court found that decedent never revealed to appellant the extent of his real estate holdings. In addition the decedent misrepresented to appellant his ownership interest in a store, Geyer Kraft Korner, which he told the appellant had been owned by his first wife. This was untrue since decedent retained ownership of this store: an interest valued at approximately 120,000 dollars. The collected value of these assets comprised more than 50% of the decedent's net worth at the time of their agreement. This can hardly be held to be full and fair disclosure.[10] Compare *Gelb Estate,* 425 Pa. 117, 228 A.2d 367 (1967) (Decedent's undervaluation of estate by more than 50% deemed to be less than full and fair disclosure). *See also Harris Estate,* 431 Pa. 293, 245 A.2d 647 (1968) *cert. denied,* 393 U.S. 1065, 89 S.Ct. 718, 21 L.Ed.2d 707 (1969).

■ We turn now to the issue of whether this antenuptial agreement made reasonable provision for appellant. In reviewing this issue we are guided by the principle that the adequacy of the agreement's provisions is to be measured by the terms of the agreement itself, not by events which occurred subsequent to it, *Hillegass Estate, supra,* 431 Pa. at 150, 244 A.2d at 674. Thus, we expressly disapprove of the Superior Court's analysis of reasonableness whereby the court considered the *inter vivos* gifts the decedent conveyed to appellant and the insurance policies which designated her as the beneficiary. *See Geyer, supra,* 338 Pa.Superior Ct. at 169, 487 A.2d at 907–908.[11]

■ The only question before that court was whether the agreement by its own terms made reasonable provision for

**10.** We think the Superior Court's reliance on the document's self-serving statement regarding full and fair disclosure was misplaced. When facts prove that a person has been misled that person's contemporaneous recorded belief that she was not misled is of no value. *See Gelb Estate,* 425 Pa. 117, 120, 228 A.2d 367, 369 (1967); *McClellan Estate,* 365 Pa. 401, 406, 75 A.2d 595, 597 (1950).

**11.** There is no question that the Superior Court utilized the post-agreement conveyances as important factors in concluding that appellant could live "comfortably" as a result of her marriage to decedent, the implication being that she had no reason to complain about her circumstances. *See Geyer supra,* 338 Pa.Superior Ct. at 170, 487 A.2d at 908.

the surviving spouse. Those terms indicate that in return for appellant's agreement to surrender her right to elect approximately 300,000 dollars the decedent agreed to convey 20,000 dollars, title to the marital residence, and unspecified household furnishings subject to decedent's option to make unlimited exceptions. Appellant also relinquished her right to a lifetime military pension of one hundred twenty-five dollars per month; plus two jobs which paid her approximately two hundred dollars per week.

The evidence at trial, which was accepted by the trial judge, indicates that the 20,000 dollar cash gift was basically equivalent to the worth of the Navy pension if the latter was reduced to a present value lump sum. Thus these two factors basically cancel out, and we are left with the question of whether the marital residence and unspecified furnishings constituted reasonable provision for an older woman who would expect to have limited opportunities for employment after the decedent's death. We think the inescapable conclusion is that this was not reasonable.

The house in question was valued at 50,000 dollars as of the time of the agreement. The house was a single home complete with a two car garage and a built-in swimming pool, and was situated on two acres of ground. The property also contained a free standing cottage which was habitable. It is evident from the record that appellant sought the security of living in this particular house as opposed to being given an asset of comparable value. Thus the question of her ability to continue to reside in this house is particularly germane.

There is little question that a house of this size, with these amenities, requires substantial general maintenance. There is evidence in the record that while decedent was alive he utilized employees from his mill to keep up the grounds. Appellant testified at the trial that she would be unable to maintain this home and continue her lifestyle based on her own resources. This testimony was accepted as true by the Orphans' Court Judge. Finding of Fact 117. Appellant's plight was predictable, especially to decedent

who, at the time of the antenuptial agreement, was well aware of the costs of running his home. Nevertheless, no provision for the home's maintenance costs were included within the agreement. The net result of this was that the conveyance of the house to appellant was doomed to fail from the beginning.

Moreover, the furnishings which were mentioned in the antenuptial agreement were an unspecified lot of personalty which were subject to decedent's unrestricted option to delete "certain items which will be designated for his child or grandchildren": an option which decedent exercised to delete almost half of the value of the furnishings only days before his death. Perhaps more importantly decedent never fulfilled his obligation to convey these furnishings since his Will made no provision for their transfer. We have previously held that such a failure to comply with the express terms of the agreement is itself reason to void the agreement. *Harrison Estate*, 456 Pa. 356, 319 A.2d 5 (1974).

In summary, in return for her love and affection, as well as the sacrifice of her own independence, decedent conveyed to the appellant nothing more than the equivalent of a pension she already had; a property which she would almost certainly have to get rid of; and the possibility of an unspecified amount of "furnishings". We can hardly say such a one-sided bargain represents reasonable provision under the *Hillegass* standard.

■ Our concern however is not at an end. Under *Hillegass, supra*, the question of what is reasonable in an antenuptial agreement ultimately becomes a question for the courts; a question that makes all antenuptial agreements potentially litigable, notwithstanding that the parties were aware of the terms of the agreement when they signed. Antenuptial agreements which are knowingly and intentionally executed should not be abrogated. Unreasonable conditions or consequences may prove that an agreement was not knowingly entered into; but absent that lack of knowledge the surviving party should be required to live with the bargain. Nonetheless, in order to enforce such an

agreement a court should be convinced that the agreement in question was in fact made knowingly and intentionally.

We acknowledge that not all marriages are made in Heaven; nor entered solely for reasons of the heart. There are also reasons of advantage less romantic but part of the realities of life. Whatever those reasons, however, our public policy does not permit one spouse to totally disinherit the other, absent an agreement to the contrary. That public policy, a token of the solemnity of the matrimonial union, requires no less than a condition that any agreement surrendering the right of a spouse to elect against the will must be made under full knowledge of that right.

■ We therefore think it is fair and reasonable, as well as sound judicial policy, to require that any agreement which seeks to change the duly enacted public policy of this Commonwealth must be based on nothing less than full and fair disclosure. Such disclosure must include both the general financial pictures of the parties involved,[12] and evidence that the parties are aware of the statutory rights which they are relinquishing.[13]

Accordingly, the Order of the Superior Court is reversed.

**12.** *See* pp. 9, 10 *supra.* *See also, In re Estate of Lopata,* 641 P.2d 952, 955 (Colo.1982).

**13.** We note that since *Hillegass* a number of our sister jurisdictions have adopted this tack. Some states have resolved this matter statutorily. *See* § 15–11–204, C.R.S.1973 (1981) (Colorado); § 474.120 R.S. Mo.1969 (Missouri); Neb.Rev.Stat. § 30.2316 (Risone 1979). *See also In Re Estate of Lopata, supra; Hosmer v. Hosmer,* 611 S.W.2d 32 (Mo.App.1980); *In Re Estate of Hill,* 214 Neb. 702, 335 N.W.2d 750 (1983). Other states have allowed their courts to resolve the matter. *See McHugh v. McHugh,* 181 Conn. 482, 436 A.2d 8 (1980); *Marschall v. Marschall,* 195 N.J.Super. 16, 477 A.2d 833 (1984); *Kosik v. George,* 253 Or. 15, 452 P.2d 560 (1969). *See generally, Rosenberg v. Lipnick,* 377 Mass. 666, 389 N.E.2d 385 (1979).

In all instances, however, those jurisdictions have recognized that a party's execution of an antenuptial agreement respresents his or her waiver of statutory rights; and since a waiver is defined as the intentional relinquishment of a known right, that right can only be "known" if there is full awareness of the governing law and the other party's assets.

ZAPPALA, J., files a concurring opinion in which PAPADAKOS, J., joins.

NIX, C.J., files a dissenting opinion in which FLAHERTY, J., joins.

FLAHERTY, J., files a dissenting opinion.

ZAPPALA, Justice, concurring.

I join the result reached by the Court but write separately to emphasize my reasoning. An antenuptial agreement, like any other agreement, must be construed in light of general principles of contract law. Thus, if the parties do not negotiate at arms length, the validity of any resulting contract is at issue. In *In re Hillegass Estate*, 431 Pa. 144, 244 A.2d 672 (1968), we held that as a matter of public policy antenuptial agreements must be given special consideration because of the relationship between the parties. However, this does not mean that we can ignore traditional contract principles in evaluating a prenuptial agreement. Thus, in disposing of this appeal, we must first look to the agreement itself to determine whether there has been a full disclosure as set forth in paragraph 7 of the agreement. A presumption arises that full disclosure has been made if the agreement so provides. However, this presumption can be rebutted upon a showing of fraud or misrepresentation. In this case, the trial court determined that the decedent misrepresented to the Appellant his ownership interest in Geyer Kraft Korner. This is a material omission which is sufficient to rebut the plain language of paragraph 7 of the agreement. Accordingly, I join in the Court's disposition and would hold that the decedent did not comply with the terms of the agreement, i.e. give the Appellant full disclosure of all his property.

PAPADAKOS, J., joins in this concurring opinion.

NIX, Chief Justice, dissenting.

In this appeal we have been called upon to determine whether an antenuptial agreement entered into by Mrs. Geyer, appellant, and the decedent precludes her from exer-

cising her statutory right to take against the will of decedent. *See* 20 Pa.C.S. § 2203. The issues raised in this appeal provided us the opportunity to review our former decisions relating to the validity of antenuptial agreements and determine whether the societal changes that occurred in the interim require a modification of former principles articulated in this area.

Regrettably, after determining that change would be appropriate, with which I agree, Mr. Justice McDermott would create a more restrictive view than even prior law required. The Opinion Announcing the Judgment of the Court would make full and fair disclosure a requirement in every antenuptial agreement. This new disclosure would require not only a general statement of the financial resources of the parties, but also would require that the complaining party must have been made "aware of the statutory rights which [he or she is] relinquishing." Slip op. at 429. Under present law, full and fair disclosure is not required until it is first determined by a reviewing court that the provision for the surviving spouse under the antenuptial agreement was not adequate. It is only after a finding that the provision for the surviving spouse was not sufficient to enable him or her to live "comfortably" after the death of the other partner to the marriage, in substantially the same way as that spouse had previously lived, that the issue of disclosure can be raised to save the validity of the agreement. Today the Opinion Announcing the Judgment of the Court would place the burden upon the proponent of the agreement to establish its validity by demonstrating that the disclosure requirement has been met, regardless of the adequacy of the provision being made for the surviving spouse.

In my view it is time that we apply the traditional rules of contract to these agreements and therefore not only discard the consideration of the adequacy of the agreement but also recognize that the traditional arm's length bargaining principle of contract law is diametrically opposed to the disclosure requirement. These agreements are nothing more than contracts and should be treated as such.

Appellant and decedent, both twice previously married and widowed, met in October, 1976. Appellant was 56 years of age and had three children from a previous marriage; decedent was 68 years of age with one son from his first marriage, five grandchildren and six great grandchildren. Shortly thereafter decedent expressed interest in marriage. Appellant was initially reluctant because remarriage would cause her to lose a Navy pension, based upon her second husband's military service. She also expressed her desire to own her own home. An agreement dated December 30, 1976, was signed by the parties in which decedent agreed to give or bequeath a sum of Twenty Thousand Dollars ($20,000) to replace the Navy pension and to give his residence, free of encumbrances, plus the furnishings therein (less those specifically designated for his child or grandchildren) to appellant if appellant survived him. The parties married on January 9, 1977. The decedent passed away on May 1, 1982, with appellant surviving him.

A will dated July 13, 1981, was offered for probate, and testamentary letters were issued to decedent's son, George W. Geyer (Executor), as executor of the estate. Appellant, as surviving spouse, elected to take against the will. The estate raised the antenuptial agreement as a bar to the election. After hearing, the Orphans' Court permitted appellant's election to take against the will, concluding that the antenuptial agreement was invalid because that agreement did not make reasonable provision for appellant and that decedent had not made full and fair disclosure to appellant. As an alternative ground for its ruling, that court also found that the decedent had breached the antenuptial agreement. The Superior Court reversed and ordered the estate to adhere to decedent's expressed intention to fulfill the requirements of the antenuptial agreement.

## I.

The law relating to antenuptial agreements initially developed at a time when the societal norm was a marriage in

which the husband had a duty to provide the economic mainstay of the family while the wife was usually relegated to the management of the home and the raising of the children. Upon the death of the husband, the surviving wife traditionally was dependent upon the assets which were left by her husband for her maintenance and support. Courts, reflecting the state interest in the protection of widows from public welfare, predicated the validity of ante-nuptial agreements upon the adequacy of the provision made for "... the wife's future security and financial protection...." *Barnhart v. Barnhart*, 376 Pa. 44, 53, 101 A.2d 904, 908 (1954).

This protective role for the future well-being of the surviving widow caused courts to proceed upon the implicit "... realization that between persons in the prematrimonial state there is a mystical, confidential relationship which anesthetizes the senses of the female partner." Gamble, *The Antenuptial Contract*, 26 U.Miami L.Rev. 692, 719 (1971–72). The court intervened as the protector of the "weaker" female and required the husband to make a full disclosure of his assets in view of such a "confidential relationship." *Id.* at 720. Consistent with this view, this Court held: "The validity of antenuptial agreements was dependent upon the presence of one of two factors: (a) a reasonable provision for the wife, or (b) in the absence of such provision, a full and fair disclosure to the wife of the husband's worth." *In re Flannery's Estate*, 315 Pa. 576, 580, 173 A. 303, 304 (1934).

The solicitous concern for the financial security of the surviving widow was evident from the language of the earlier decisions.

> ... [A] duty arises having no place in the ordinary contractual relationship to be frank and unreserved in the disclosure of all circumstances materially bearing upon the contemplated agreement. While such an agreement will not be invalidated by reason of the mere fact that the wife does not receive as much as she would be legally entitled to receive in the absence of the agreement, since

the only purpose of such contracts is to change the provision he makes for her, it must be taken to be well settled that where no provision is made for the wife, or the provision made for her is unreasonably disproportionate to the then means of the intended husband, it raises a presumption of designed concealment and throws the burden on those alleging the validity of the agreement to show that it was fairly made: [citations omitted] ... *'The true test of the adequacy of the consideration in an antenuptial agreement ... is whether the provision for the intended wife is sufficient to enable her to live comfortably after [the husband's] death, in substantially the same way as,* considering all the circumstances, *she had previously lived.'* (footnote omitted) (emphasis added) *In re Groff's Estate,* 341 Pa. 105, 110, 19 A.2d 107, 109–110 (1941).

The obvious intention of the earlier decisions was to protect the intended wife from having her financial situation eroded by a deceiving suitor. *In re Estate of Gelb,* 425 Pa. 117, 228 A.2d 367 (1967); *In re Zeigler's Estate,* 381 Pa. 436, 113 A.2d 271 (1955); *In re McClellan's Estate,* 365 Pa. 401, 75 A.2d 595 (1950); *In re Emery's Estate,* 362 Pa. 142, 66 A.2d 262 (1949); *In re Groff's Estate, supra; In re Flannery's Estate, supra.* This concern is further evident in our decision in *Barnhart v. Barnhart, supra,* 376 Pa. at 53, 101 A.2d at 908:

In most cases of antenuptial agreements the parties to the contract are ordinarily concerned with the wife's future security and financial protection, .... A majority of cases litigated are instances where the wife alleges that she has been deceived concerning the extent of her husband's resources. This Court has consistently decided that the validity of such agreements requires the utmost of good faith between the parties, a reasonable provision made, or a full and fair disclosure of worth. (citations omitted)

The clear underlying assumption reflected in these decisions was that the intended wife was in an inferior bargain-

ing position and therefore incapable of participating in arm's length bargaining with her future husband. Thus, when an objection was made to an antenuptial agreement the court would first look to whether there was a reasonable provision made for the intended wife. *See, e.g., Kaufmann Estate,* 404 Pa. 131, 137, 171 A.2d 48, 51 (1961). While the more recent formulations have used more sexually neutral language in describing the test to be employed in determining the validity of these agreements,[1] *see, e.g., In re Hillegass,* 431 Pa. 144, 244 A.2d 672 (1968), most of these cases in this area relate to the *surviving widow's* right of election.[2]

## II.

Under traditional contract law the adequacy of consideration is not a factor to be considered in determining the validity and enforceability of a contract. *Thomas v. Thomas Flexible Coupling Co.,* 353 Pa. 591, 46 A.2d 212 (1946); *Hillcrest Foundation Inc. v. McFeaters,* 332 Pa. 497, 2

1. The Act of April 8, 1833, P.L. 249 § 11 (repealed), specifically conferred the right to elect to take against the will on the surviving widow. Subsequently, the statute has been modified to permit either surviving spouse to have that election, 20 Pa.C.S. § 2203.

2. *In re Estate of Cummings,* 493 Pa. 11, 425 A.2d 340 (1981) (surviving wife could not elect against decedent's will where there was an inconsequential deviation not affecting the rights of the parties or altering the agreement); *Estate of Friedman,* 483 Pa. 614, 398 A.2d 615 (1978) (widow was barred by the terms of the antenuptial agreement from claiming half of the estate where decedent's will was changed by operation of law and neither existence of oral contract nor waiver of the Dead Man's Act were shown); *In re Estate of Ratony,* 443 Pa. 454, 277 A.2d 791 (1971) (surviving wife could not elect to take against decedent's inter vivos conveyances 27 years after signing a valid postnuptial separation agreement which divided net proceeds from the sale of entireties property); *In re Estate of Rosciolo,* 434 Pa. 461, 258 A.2d 623 (1969) (widow barred from electing against decedent's will by the terms of a valid antenuptial agreement expressly precluding such election); *In re Estate of Vallish,* 431 Pa. 88, 244 A.2d 745 (1968) (surviving widow could elect to take against decedent's will where no provision was made for her in the antenuptial agreement). Although in a number of these cases the result precluded the election to take against the will, this conclusion was reached only after the Court had been satisfied that the surviving widow had been "fairly" treated.

A.2d 775 (1939); *see generally* 1 S. *Williston on Contracts,* § 115 (3d Ed.1957). It is also true that a requirement of "full and fair" disclosure is at odds with the arm's length bargaining concept which is accepted under traditional contract law. *Brown v. Hall,* 495 Pa. 635, 435 A.2d 859 (1981); *Frowen v. Blank,* 493 Pa. 137, 425 A.2d 412 (1981); *Young v. Kaye,* 443 Pa. 335, 279 A.2d 759 (1971); *Carrier v. William Penn Broadcasting Co.,* 426 Pa. 427, 233 A.2d 519 (1967). As noted, the doctrine of full and fair disclosure originated at a time when it was assumed that the woman was necessarily in an inferior bargaining position and required solicitous concern. For this reason the law also provided special rights to a surviving widow that were not given to the surviving widower. Act of April 8, 1833, P.L. 249, § 11 (repealed). It therefore followed that enhanced scrutiny was properly given to any contractual arrangement whereby the surviving wife may compromise that protection which the law had afforded.

The societal changes that have occurred during the second half of this century warrant reconsideration of the principles that initially governed these antenuptial agreements designed to determine the intended wife's share to be given in the event of the prospective groom's death. The wife is no longer necessarily the homemaker and the husband the breadwinner. Quite frequently both spouses are wage earners and there are instances where the wife's income or earning capacity exceeds that of the husband. Although, unfortunately, we have as yet to reach sexual equality in the market place, there are compelling forces moving in that direction and hopefully the objective will be obtained in the near future. Additionally, there is now a strong public policy of constitutional dimension in this Commonwealth prohibiting any sexual discrimination in our laws. Pa. Const. art. 1, § 28; *DiFlorido v. DiFlorido,* 459 Pa. 641, 650–51, 331 A.2d 174, 179 (1975); *Henderson v. Henderson,* 458 Pa. 97, 101, 327 A.2d 60, 62 (1974). That policy has already impacted upon the law insofar as it has occasioned a change in the former provision that provided for the widow's election to take against the will, which now

is the election of a spouse regardless of sex. 20 Pa.C.S. § 2203. These sociological changes have brought about many adjustments in former common law concepts. *See, e.g., Commonwealth ex rel. Spriggs v. Carson,* 470 Pa. 290, 368 A.2d 635 (1977) (plurality opinion) ("tender years doctrine" employed in child custody cases is offensive to constitutional principle of equality of the sexes); *Commonwealth v. Santiago,* 462 Pa. 216, 340 A.2d 440 (1975) (doctrine of "coverture" requiring presumption that wife who commits crimes in husband's presence was coerced by husband discarded); *Conway v. Dana,* 456 Pa. 536, 318 A.2d 324 (1974) (support of children is equal responsibility of both mother and father); Married Women's Property Act, Act of July 17, 1957, P.L. 969, No. 417, § 1, 48 P.S. § 32.1 (repealed 1985) (allowing express contracts between husband and wife and permitting married women to own property).

The prior stereotyped concept of individuals which presumed gender inferiority has given way to constitutional mandate and public policy which require gender neutrality. I would be the first to acknowledge that we have yet to achieve the stated goal of gender neutrality. Equally regrettable is that there is still a significant element in our society who appear to be determined to perpetuate former discriminatory practices against the female sex. However, we do not serve the cause of true equality by creating legal fictions, even when those fictions are designed to protect against some of these inequities. Moreover, I am not satisfied that the suggested scheme would serve the purpose that Mr. Justice McDermott envisions or that the need perceived by him actually exists.

As to the latter, antenuptial agreements are normally employed by more sophisticated parties who are well aware of the effect of such an agreement. These are individuals who, sometimes as a result of prior marriages or other relationships, acquired certain property and have definite plans for its disposition after their death—plans which they do not want interfered with as a result of the new relationship. The facts of this case provide the clearest example of

parties who were, in fact, aware that their impending marriage would affect their rights in the subsequent disposition of their respective property and for that reason entered into the agreement to effectuate their plans for the disposition of the property in question.

It is quite true that there is a strong policy against one spouse attempting to disinherit the other spouse after that relationship has soured. This, of course, is the reason that the surviving spouse has been given the right to elect to take against a will providing for a testamentary disposition less favorable than that provided under the intestate laws. However, it has never been suggested that the surviving spouse cannot agree to accept a share less than the statutory provision nor is it against public policy for parties to an impending marriage to make such a condition for entering into that marriage. Indeed, the Opinion Announcing the Judgment of the Court ignores that in this very case the antenuptial agreement was initiated to satisfy the prospective wife who otherwise would have been reluctant to enter into that relationship. The purposes of such antenuptial agreements are unquestionably proper and it is the duty of courts to protect those commitments. The only legitimate issue raised in this appeal was whether or not the alleged breach of the agreement was in fact a material breach so as to nullify the agreement. In resolving this question clearly the normal rules of contract would adequately protect all the parties involved.[3] Unfortunately, the Opinion Announc-

3. The Opinion Announcing the Judgment of the Court seems to suggest that the decedent did in fact misrepresent the extent of his assets. *See* slip op. at 428. However, from a reading of the record, it is far from clear that such a misrepresentation was in fact made by the decedent. In any event, if in fact there was a misrepresentation, appellant would be entitled to seek relief under traditional contract principles. *See, e.g., College Watercolor Group, Inc. v. William Newbauer, Inc.,* 468 Pa. 103, 360 A.2d 200 (1976); *Myers v. Rubin,* 399 Pa. 363, 160 A.2d 559 (1960); *LaCourse v. Kiesel,* 366 Pa. 385, 77 A.2d 877 (1951); Restatement (Second) of Contracts, § 164 (1981).

Additionally, the attempted creation of a new obligation of disclosure was entirely unnecessary in this case. As indicated in the concurring opinion of Mr. Justice Zappala, the terms of the contract itself provided for such a disclosure. Thus, noncompliance with that

ing the Judgment of the Court failed to address that question.

I, therefore, would agree with the Superior Court's mandate remanding the matter to the Orphans' Court. I would also permit the appellant the opportunity to attempt to establish any alleged breach.

FLAHERTY, J., joins in this dissenting opinion.

FLAHERTY, Justice, dissenting.

I dissent. Numerous societal changes have impacted upon family units in recent times, and the law has advanced accordingly to recognize the equal status of men and women in our society. No longer are women regarded as the "weaker" party in a marriage, or in society generally. Accordingly, the law has discarded presumptions and protections that arose to protect women from the inferiorities and incapacities which they were perceived as having in earlier times.

Enlightened thinking has accorded equality between the sexes, and, with that equality, it has become inconsistent to preserve special protections that arose in response to perceived inequalities. Certainly, it is not surprising that persons may attempt to reap the benefits of being "equal," while asserting the need for special protections in areas where it would be self-serving to assert certain limited inequalities. To enjoy the benefits of being equal, however, without sharing in the burdens thereof, would be unsupportable. In recognition of this, the law has accorded equal rights to all spouses, without reference to gender. In the context of the instant case, where the validity of an antenuptial agreement is at issue, there is no basis for allowing to stand an implicit presumption that spouses are of unequal status or not knowledgeable enough to understand the nature of the contracts they enter. If, in fact, there is fraud, misrepresentation, or overreaching, then traditional principles of contract law provide an adequate remedy.

requirement would constitute a material breach, thereby invalidating the agreement.

The opinion authored by Mr. Justice McDermott reaches a contrary result. Instead of applying the traditional rule of contract law that binds one to the contents of agreements entered, a contrary rule is applied, which, in effect, binds one only if it is determined that the terms, and effects, of the agreement were fully understood. This is a departure from longstanding, traditional principles of contract law. See *Standard Venetian Blind Co. v. American Empire Insurance*, 503 Pa. 300, 305, 469 A.2d 563, 566 (1983) (failure to read a contract does not warrant avoidance or nullification of its provisions); *Estate of Brant*, 463 Pa. 230, 235, 344 A.2d 806, 809 (1975); *Bollinger v. Central Pennsylvania Quarry Stripping & Construction Co.*, 425 Pa. 430, 432, 229 A.2d 741, 742 (1967) ("Once a person enters into a written agreement he builds around himself a stone wall, from which he cannot escape by merely asserting he had not understood what he was signing."); *Montgomery v. Levy*, 406 Pa. 547, 550, 177 A.2d 448, 450 (1962) (one is legally bound to know the terms of the contract entered). Based upon these principles, the terms of the instant antenuptial agreement should be regarded as binding, without inquiry into whether the significance of the agreement was understood by the party against whom enforcement is sought.