JOURNAL ENTRY and OPINION
{¶ 1} Dianne F. Millstein filed eight notices of appeal from separate domestic relations court judgments in connection with her divorce from Norman Millstein.
{¶ 2} In Appeal No. 79617, she challenges the April 11, 2001 order of the court which modified her ex-husband's child support obligation from $7,900/month per child for two children of the marriage, Alana and Joshua, to $7,900/month for Alana after the court granted him custody of his minor son, Joshua. In Appeal No. 79754, she contends that the court erred in its May 15, 2001 order, which denied her motion to vacate that child support modification order.
{¶ 3} In Appeal Nos. 80184, 80185, 80186 and 80187, she contests the validity of four court orders, three regarding custody and schooling of Joshua and one regarding the court's exercise of jurisdiction over a $72,000 state income tax credit issued to Norman Millstein but intercepted by the Child Support Enforcement Agency.
{¶ 4} In Appeal No. 80188, she asserts the court erred in its September 24, 1999 judgment, which found the parties' prenuptial agreement valid, and in its division of property and award of spousal support in its August 13, 2001 final judgment and divorce decree.
{¶ 5} And in App. No. 80963, she argues that the court erred in denying her motion to vacate a post decree temporary restraining order involving the education of Joshua.
{¶ 6} Norman Millstein and Kevan Millstein, individually and as Trustee of the Millstein Family Gift Trust, the AL-JO Trust, and the Kevan Millstein Trust (the Trusts), have filed separate cross-appeals from the final judgment and divorce decree, thereby seeking to preserve certain arguments in the event we do not affirm the trial court.
{¶ 7} After a thorough review of the extensive record filed here, we have concluded that the court did not commit reversible error in issuing its orders. Accordingly, we reject each appeal, conclude that the cross-appeals are moot, and therefore affirm the respective judgments of the trial court.
{¶ 8} The history of the case reflects that after his first divorce, sometime in 1975, Norman Millstein, then aged 46, met Dianne Falcone, aged 22, while both were living in the same apartment complex in Bedford, Ohio. She had been previously divorced as well. They began dating, and later that year Norman offered Dianne a job as a leasing agent for an apartment complex in Las Vegas, Nevada, in which he had a partial interest.
{¶ 9} The couple continued their relationship, and approximately one year later, in August 1976, Dianne returned to Cleveland and began living with Norman. Thereafter, they began to discuss marriage; at that time, Norman had an estimated net worth of $28 million while Dianne had a net worth slightly over $10,000.
{¶ 10} In contemplation of marriage, and in furtherance of his desire to limit Dianne's interest in his estate, and to protect the interests of his five children from his previous marriage, Norman insisted that he and Dianne enter into a prenuptial agreement. Norman retained Morlee Rothchild to draft the agreement, and Dianne retained her own counsel, William Kraus. After about six weeks of negotiations, on September 19, 1981, the parties signed the prenuptial agreement, which set forth the parties' respective rights in the event the marriage should terminate.
{¶ 11} Five days later, on September 24, 1981, Norman and Dianne married in a private ceremony by Judge Manny Rocker. Two children were born as issue to this marriage, Alana [d.o.b. 6-17-84] and Joshua [d.o.b. 6-3-86].
{¶ 12} Dianne became unhappy in the marriage, and by 1997, she retained a divorce attorney. Thereafter, on March 3, 1998, she sued for divorce, and later joined N.K.M. Investment Co., Ltd., and Kevan Millstein, individually and as the Trustee of the Millstein Family Gift Trust, the AL-JO Trust, and the Kevan Millstein Trust, as additional defendants.
{¶ 13} On August 21, 1988, the court journalized an interim agreed entry, whereby Dianne obtained custody of the couple's two minor children and Norman agreed to pay her spousal support of $3,000/ month and child support in the amount of $7,900/month per child, for an aggregate support obligation of $18,800/month.
{¶ 14} Throughout the course of the divorce proceedings, Dianne challenged the prenuptial agreement; as a result, the court litigated that issue separately from July 7 through July 13, 1999. Following those proceedings, on September 24, 1999, the court issued an order finding the prenuptial agreement to be valid and enforceable.
{¶ 15} The court thereafter conducted trial on the remaining issues in the case from March 6, to April 17, 2000.
{¶ 16} Following trial, the court apparently learned that Dianne had unilaterally removed Joshua from his private residential school in California, in violation of the shared parenting plan. Therefore, it ordered her to return him to the school, and upon her failure to do so, on November 15, 2000, the court made Norman the custodial parent of Joshua. Thereafter, on April 6, 2001, Norman filed a motion to modify child support to eliminate his $7,900/month payment to Dianne for the care of Joshua; the court granted this motion on April 11, 2001. Thereafter, on April 26, 2001, Dianne moved to vacate the modification of child support, which the court denied on May 15, 2001. Dianne then filed her first two appeals, designated App. Nos. 79617 and 79754, from these orders relating to the modification of child support.
{¶ 17} On August 13, 2001, the court entered a final decree of divorce in which it awarded the parties their respective separate properties and divided the marital property; it also awarded $3,000/month spousal support for Dianne until June 2002 and ordered that sum increased to $9,000/month after that date until her death, remarriage or expiration of 110 months; it also awarded child support of $7,900/month for Alana. The court also incorporated a shared parenting plan into its final divorce decree, which named Norman as the residential parent for school enrollment purposes.
{¶ 18} On September 4, 2001, Dianne filed five additional notices of appeal, four of which (App. Nos. 80184, 80185, 80186, and 80187) challenged what she termed ex parte court orders relating to an Ohio tax credit and Joshua's schooling and custody. The other appeal (App. No. 80188) challenged the court's finding regarding the validity of the prenuptial agreement and the final decree of divorce. Thereafter, Norman and the Trusts cross-appealed. We will consider each of these appeals sequentially.
{¶ 19} Following the final decree of divorce, Norman, the party named by the court in its August 18, 2001 order as the residential parent for school enrollment purposes, attempted to enroll Joshua in the Beachwood High School; however, he alleges Dianne had enrolled him in the Orange School System, where he had been repeatedly absent from school, received failing grades, and associated with those who exerted a negative influence on him.
{¶ 20} "In response to that situation, on December 3, 2001, Norman filed a motion to allow him to enroll Joshua in a CEDU program and he sought a temporary restraining order to prevent Diane from interfering with such enrollment. The court granted the motion on December 4, 2001. On January 7, 2002, Dianne moved to vacate the T.R.O. alleging improper service, but the court denied that motion on January 30, 2002. She then filed another notice of appeal (App. No. 80963) on March 1, 2002. We have now consolidated all eight appeals for review."
 APPEAL NOS. 79617 AND 79754 (The Modification of Child Support)
{¶ 21} In these separate appeals, Dianne contests the propriety of the court order which modified Norman's child support obligation consistent with its order giving him custody of Joshua, and its subsequent order denying her motion to vacate that child support modification order. She presents two assignments of error:
 {¶ 22} "THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN GRANTING APPELLEE'S MOTION TO REDUCE AND/OR MODIFY CHILD SUPPORT."
 {¶ 23} "THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN DENYING APPELLANT'S MOTION TO VACATE THE EX PARTE ORDER OF APRIL 11, 2001."
{¶ 24} Dianne argues that the court erred in granting Norman's motion to reduce his child support obligation, urging that Dom.R.Loc.R. 19 and R.C. 3113.215(B)(4) require the court to conduct a hearing before granting such a motion.
{¶ 25} Norman, relying on Kelm v. Kelm (1994), 93 Ohio App.3d 686,689, 639 N.E.2d 842, and Mekker v. Mekker (Dec. 23, 1999), Portage App. Nos. 98-P-0006, 98-P-0007 and 98-P-100, claims that temporary child support orders are not final appealable orders because they are subject to modification at any time, and he therefore asserts that we should summarily dismiss these appeals. He further argues Dom.R.Loc.R. 17(D)(3) mandates that any modification of the allocation of parental rights shall also adjust child support; thus, he maintains that the court's order is proper, notwithstanding any procedural defect.
{¶ 26} We will initially address Norman's argument that these are not final appealable orders. In Mekker, supra, the court observed:
 {¶ 27} "This does not mean, however, that [appellant] had no recourse for appealing the amounts of temporary child and spousal support ordered by the magistrate and adopted by the trial court. `Claimed prejudicial error with respect to an interlocutory order may be reviewed on appeal after a judgment, decree, or final order is entered in the case in which the interlocutory order was entered.' (Footnote omitted) Whiteside, Ohio Appellate Practice (2000), Section 2.20, at 51. See, also, DiLacqua, 88 Ohio App.3d at 57. Consequently, temporary support orders, like other interlocutory orders, are reviewable after the entry of a final decree disposing of the overall action in which they were entered. * * *"
{¶ 28} We agree with this analysis and have concluded that the orders in these appeals became subject to review after the court entered its final judgment on August 13, 2001.
{¶ 29} The appropriate standard of review for cases of this distinction is abuse of discretion. As we stated in Phillips v. Phillips (Sept. 13, 2001), Cuyahoga App. No. 78340:
 {¶ 30} "We begin by stating that an appellate court will not reverse a child support modification absent an abuse of discretion. Booth v. Booth (1989), 44 Ohio St.3d 142, 541 N.E.2d 1028. Abuse of discretion consists of more than an error of judgment; it connotes an attitude on the part of the trial court that is unreasonable, unconscionable or arbitrary. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140."
{¶ 31} Dianne relies on Dom.R.Loc.R. 19 and R.C. 3113.215(B)(4) to support her position that the court abused its discretion in modifying the support obligation without first conducting a hearing. She argues that because R.C. 3113.215(B)(4) requires the court to recalculate before modifying child support, that statute "anticipates" a hearing. However, a review of the language of the statute reveals that it neither refers to nor mandates a hearing.
{¶ 32} Dom.R.Loc.R. 19(B), on the other hand, contemplates a hearing. That rule states in part:
 {¶ 33} "Prior to the time of hearing on any motion to modify child support or spousal support each party shall have completed an Income and Expense Statement, * * * Each party shall also present documentation of his/her current earning at time of hearing."
{¶ 34} Further, in Richter v. Casper (Dec. 18, 1997), Cuyahoga App. No. 71892, citing Andrulis v. Andrulis (1985), 26 Ohio App.3d 164,498 N.E.2d 1380, and McGann v. McGann (Oct. 24, 1991), Cuyahoga App. No. 59197, we stated, "Modification of visitation or support may be accomplished only after notice and a hearing on such motion."
{¶ 35} Norman asserts that because the court modified the allocation of parental rights and responsibilities when it granted him temporary custody of Joshua, Dom.R.Loc.R. 17(D)(3) mandated the modification of his child support obligation. That rule provides:
 {¶ 36} "Any order modifying an allocation of parental rights and responsibilities shall also adjust child support obligations and visitation rights to the parent not the residential parent."
{¶ 37} Generally, the failure to follow procedural rules does not constitute reversible error unless the appellant demonstrates prejudice. See, e.g., Hoover v. Consolidated Rail Corp. (Oct. 31, 1985), Cuyahoga App. No. 49739, citing Barnes v. Prince (1974), 41 Ohio App.3d 244,535 N.E.2d 702. This general rule has also been applied to procedures set forth for domestic relations courts by rule or statute. See, e.g., Headley v. Headley (May 29, 1997), Franklin App. No. 96APF07-954 ("While the trial court did not strictly comply with the statutory procedure, plaintiff cannot show prejudice from the court's failure * * * and any error in this regard was harmless."), citing Dillaplain v. Dillaplain (Jan. 26, 1994), Greene App. No. 93-CA-43; McCoy v. McCoy (1995),105 Ohio App.3d 651, 664 N.E.2d 1012.
{¶ 38} Here, Dianne has not demonstrated prejudice from the court's procedural failure to conduct a hearing; in this instance, therefore, it is harmless error as the record supports the trial court's decision to discontinue support payments for Joshua after Norman gained custody of his son.
{¶ 39} Based on the foregoing, the trial court properly exercised its discretion in modifying child support to reflect Joshua's change of custody. Accordingly, we reject these assignments of error and affirm the judgments appealed from in App. Nos. 79617 and 79754.
 APPEAL NOS. 80184, 80185, 80186 AND 80187 (The State Income Tax Credit and the Custody and Schooling of Joshua)
{¶ 40} In her challenge to four ancillary orders of the court, Dianne has presented one assignment of error for consideration. It states:
 {¶ 41} "THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN ISSUING NUMEROUS POST-TRIAL EX PARTE JUDGMENT ENTRIES."
{¶ 42} Initially, we note that Dianne refers to these orders as ex parte, but there is no evidence of any improper communication between her ex-husband and the court; rather, she acknowledges that the court issued these orders without any motion from her ex-husband. Therefore, they are more appropriately categorized as sua sponte orders. We shall consider these orders sequentially.
{¶ 43} During the course of the domestic court proceedings, the Child Support Enforcement Agency intercepted a $72,000 Ohio tax credit due Norman. Dianne filed a notice of garnishment in Cleveland Municipal Court seeking to obtain those funds, but before that case could be adjudicated, on May 8, 2002, the domestic relations court issued an order taking exclusive jurisdiction of these funds.
{¶ 44} In challenging this domestic relations court order, Dianne relies upon Dom.R.Loc.R. 28(B)(1), which provides that, when a journal entry is prepared by party or counsel, the opposing party or his counsel shall have 3 days in which to approve or reject the judgment entry. Dianne insists that Norman's counsel prepared this order, or at least contacted the court in this regard, urging that the court could not have known about these funds but for ex parte contact by Norman's counsel. However, there is no evidence in the record to prove that either Norman or his counsel contacted the court or prepared this order. We will not assume, as Dianne urges us to do, that the trial judge violated Canon 3(B)(7) of the Code of Judicial Conduct or that Norman's counsel violated DR 7-110 of the Code of Professional Responsibility by partaking in ex parte communications.
{¶ 45} Next, as part of a shared parenting agreement, both Dianne and Norman agreed to place Joshua in a private school. Based on the recommendation of a placement counselor, they enrolled Joshua in the C.E.D.U. School in Running Shine, California.
{¶ 46} Thereafter, in violation of the shared parenting plan, Dianne unilaterally removed her son from that school without either court authorization or consent from her ex-husband. As a result, on October 31, 2000, the court ordered Dianne to return Joshua to the school within 48 hours. When she failed to do so, the court issued its November 15, 2000 order awarding temporary custody of Joshua to Norman and again ordering her to return her son to the school. Despite these orders, she failed to return Joshua to the school and, therefore, on December 13, 2000, the court ordered the sheriff to assist Norman in obtaining custody of Joshua.
{¶ 47} Dianne contends that these were also ex parte orders and therefore violated Dom.R.Loc.R. 28. However, she acknowledges that her ex-husband did not file any motion to obtain these orders, and there is no indication in the record that either Norman or his counsel prepared them. Further, as discussed above, we will not simply assume ex parte communications without actual proof. Accordingly, we have concluded these were sua sponte court orders which do not violate Dom.R.Loc.R. 28. We therefore find no merit to this assignment of error.
 APPEAL NO. 80199 (The Prenuptial Agreement and the Final Divorce Decree)
{¶ 48} In connection with her challenge to the validity of the prenuptial agreement, Dianne presents one assignment of error for our review. It states:
 {¶ 49} "THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN FINDING THAT THE PRENUPTIAL AGREEMENT WAS VALID."
{¶ 50} Dianne argues that the prenuptial agreement is invalid because Norman failed to fully disclose the nature, value, and extent of his assets. She further alleges fraud, duress, coercion, and overreaching because Norman did not give her an opportunity to negotiate a more equitable agreement and she felt forced to sign it or face cancellation of the wedding.
{¶ 51} Norman, on the other hand, asserts that Dianne had full knowledge of the nature and extent of his assets before she signed the prenuptial agreement; that she retained highly competent counsel during the six weeks of prenuptial negotiations; that she failed to prove fraud, duress, coercion, or overreaching; and that she could have postponed the date of marriage for further negotiations because the couple had made no specific wedding arrangements.
{¶ 52} In its syllabus in Gross v. Gross (1984), 11 Ohio St.3d 99,464 N.E.2d 500, the court established the following test to determine the validity of a prenuptial agreement:
 {¶ 53} "2. Such agreements are valid and enforceable (1) if they have been entered into freely without fraud, duress, coercion, or overreaching; (2) if there was full disclosure, or full knowledge and understanding of the nature, value and extent of the prospective spouse's property; and (3) if the terms do not promote or encourage divorce or profiteering by divorce."
{¶ 54} It is well established that a prenuptial agreement that is freely and voluntarily entered into will not be invalid merely because it makes a disproportionate distribution. See Fletcher v. Fletcher,68 Ohio St.3d 464, 466, 1994-Ohio-434, 628 N.E.2d 1343, citing Juhasz v. Juhasz (1938), 134 Ohio St. 257, 16 N.E.2d 328, paragraph one of the syllabus.
{¶ 55} As for the burden of proof, in Fletcher, the court stated in its syllabus:
 {¶ 56} "1. When an antenuptial agreement provides disproportionately less than the party challenging it would have received under an equitable distribution, the burden is on the one claiming the validity of the contract to show that the other party entered into it with the benefit of full knowledge or disclosure of the assets of the proponent. The burden of proving fraud, duress, coercion or overreaching, however, remains with the party challenging the agreement."
{¶ 57} In Fletcher, the court further set forth the standard of review at page 468:
 {¶ 58} "This court will not reweigh the evidence introduced in a trial court; rather, we will uphold the findings of the trial court when the record contains some competent evidence to sustain the trial court's conclusions. Ross v. Ross (1980), 64 Ohio St.2d 203, 18 O.O.3d 414, 414 N.E.2d 426. In addition, we will indulge all reasonable presumptions consistent with the record in favor of lower court decisions on questions of law. In re Sublett (1959), 169 Ohio St. 19, 7 O.O.2d 487, 157 N.E.2d 324. When a trial court, sitting without a jury, determines an issue but does not make separate findings of fact and conclusions of law, a reviewing court will presume the validity of that judgment as long as there is evidence in the record to support it. Scovanner v. Toelke (1928), 119 Ohio St. 256, 163 N.E. 493, paragraph four of the syllabus." (Emphasis added.)
{¶ 59} Under Gross, the first issue for us to determine is whether Dianne entered into the prenuptial agreement freely and without fraud, duress, coercion, or overreaching. Under Fletcher, Dianne had the burden to prove fraud, duress, coercion, or overreaching.
{¶ 60} It is undisputed that Norman had been previously married to Hensha Stone, that his first marriage produced five children, and that it ended in a protracted divorce. Therefore, when he and Dianne Falcone began to discuss marriage, Norman retained Morlee Rothchild to negotiate and draft a prenuptial agreement. Dianne independently retained William J. Kraus, whom the court referred to as "one of the foremost domestic relations attorneys at that time," to represent her in this matter.
{¶ 61} Courts have usually concentrated on whether the spouse challenging the prenuptial agreement had independent legal representation, see Rowland v. Rowland (1991), 74 Ohio App.3d 415,599 N.E.2d 315, or at the very least, an opportunity to consult with an attorney. See Wiethe v. Beaty (Feb. 16, 1999), Warren App. No. CA98-04-049 (court determined that wife had the agreement for two days, which provided her ample opportunity to seek the advice of counsel before signing).
{¶ 62} Dianne, however, maintains that, although represented by Kraus, Norman and his counsel did not afford her attorney an opportunity to actively negotiate the terms of the agreement, that Kraus felt "emasculated" by the negotiation process, and that Norman dictated the terms of the agreement. The trial court found conflicting testimony on the extent of the negotiation but concluded that Kraus participated in negotiating the agreement, and the evidence supports this finding.
{¶ 63} Further, it is undisputed that Norman presented Dianne's counsel with the final draft of the agreement on September 11, 1981, but that she did not sign it until September 19, 1981. As such, if unhappy with the terms of the agreement, Dianne had ample time to pursue changes, to retain new counsel, or to refuse to sign it.
{¶ 64} Moreover, we agree with the court's rejection of her claim that she did not want to further postpone the wedding. The record demonstrates that the parties had not made formal wedding arrangements and that they were eventually married privately by Judge Manny Rocker. As the Ohio Supreme Court stated in Fletcher, supra:
 {¶ 65} "* * * It is agreed that Dyane (sic) was given the opportunity to consult with independent counsel, but refused. Although the parties executed the agreement the day before the wedding, the trial court could reasonably have concluded that, because of the small size and informality of the impending wedding, it could have been postponed had Dyane (sic) wished to consult counsel. Finally, there is some evidence from which to conclude that Dyane (sic) read the agreement and understood its contents prior to signing it." (Emphasis added.)
{¶ 66} Here, Dianne had the agreement for at least a week before her marriage and could have postponed the wedding without undue embarrassment if she chose to further negotiate terms in the prenuptial agreement. As such, the trial court found that Dianne signed the prenuptial agreement freely and voluntarily and without fraud, duress, coercion, or overreaching, and this finding is supported by competent, credible evidence.
{¶ 67} Regarding the disclosure element, Norman had the burden to demonstrate either full disclosure or Dianne's knowledge and understanding of the nature, value and extent of his property at the time she signed the agreement. See Fletcher, supra.
{¶ 68} Dianne claims that Norman concealed the following business interests from her: Amusement Leasing Company; Bishop Park Towers; Concord Company; CV 600 Hull Associates; CV 640 Hull Associates; Convair Aircraft Associates; Convair Airframe Associates; Convair Engine No. 1 Associates; Convair Engine No. 2 Associates; Convair Propellor Associates; FM Company; MF Company; Metro City No. 1; Metro City No. 2; Nance Realty Company; North Coast Energy 1981 Drilling; WA1 Investors; Multi Builders Supply; and Multi Management, Inc.
{¶ 69} At trial, however, Norman testified that most of these properties were looped together in the prenuptial agreement: he expressly listed Food Games, which included his interest in Amusement Leasing Company; he listed Bishop Park Estates, which included his interest in Bishop Park Towers; he listed Wright Airlines, which included his interests in CV 600 Hull Associates, CV 640 Hull Associates, Convair Aircraft Associates, Convair Airframe Associates, Convair Engine No. 1 Associates, Convair Engine No. 2 Associates, and Convair Propellor Associates; he listed Randall Park Mall, which included his interests in FM Company and MF Company; and he listed Euclid Mall, which included his interests in Metro City No. 1 and Metro City No. 2.
{¶ 70} Norman further testified that he did not list Multi Builders Supply and Multi Management, Inc. in the prenuptial agreement because they were merely pass through companies with no value. In addition, he did not list Nance Realty Company, North Coast Energy 1981 Drilling, or WA1 Investors because none of these assets was income-producing in 1981.
{¶ 71} Based on this testimony, the court found that Norman inadvertently failed to disclose only one asset, Concord Company. The court further found, based on the relatively insignificant value of the Concord Company, $34,000, in comparison to Norman's disclosed wealth in excess of $28 million, that this failure had no material impact on Dianne's decision to sign the prenuptial agreement.
{¶ 72} Although no Ohio court has yet specifically defined full disclosure, other jurisdictions have consistently held that a spouse's general knowledge of the character and extent of the other's wealth and assets is sufficient to validate a premarital agreement. See, e.g., Adams v. Adams (1992), 414 Pa. Super. 634, 607 A.2d 1116, 1118, quoting Nigro v. Nigro (1988), 371 Pa. Super. 625, 631, 538 A.2d 910, citing In re Estate of Geyer (1987) 516 Pa. 492, 533 A.2d 423. ("It is well settled that the disclosure need not be exact, so long as it is `full and fair,' * * * and does not `obscure the general financial resources of the parties.'")
{¶ 73} See, also, Harbom v. Harbom (2000), 134 Md. App. 430,760 A.2d 272; Davis v. Miller (2000), 269 Kan. 723, 7 P.3d 1223; Wilson v. Moore (Tenn.App. 1996), 929 S.W.2d 367; Pajak v. Pajak (1989),182 W. Va. 28, 385 S.E.2d 384; Thies v. Lowe (1995), 273 Mont. 272,903 P.2d 186.
{¶ 74} These courts have frequently cited to Lindey, Separation Agreements and Antenuptial Contracts, S90-44, as the seminal work on this topic. See Harbom, supra; Levin v. Levin (Feb. 25, 1994), 1994 Conn. Super. LEXIS 475. As Lindey stated in his treatise:
 {¶ 75} "While the disclosure should be full, fair and open, it has been said it need not be a drastically sweeping one, and the wife need not know the husband's exact means, so long as she has a general idea of his property and resources."
{¶ 76} As the Tennessee court stated in Wilson v. Moore, supra, at 371:
 {¶ 77} "* * * most courts have not construed the full and fair disclosure requirement to mandate detailed disclosures such as financial statements, appraisals, balance sheets, or the like. In re Estate of Lopata, 641 P.2d 952, 955 (Colo. 1982); In re Thies (Thies v. Lowe), 273 Mont. 272, 903 P.2d 186, 189
(Mont. 1995); In re Estate of Geyer, 516 Pa. 492, 533 A.2d 423, 427 (Pa. 1987); Hartz v. Hartz, 248 Md. 47, 234 A.2d 865, 871 n. 4 (Md. 1967); In re Estate of Hill, 214 Neb. 702, 335 N.W.2d 750, 753 (Neb. 1983); see also, 2 John Tingley Nicholas P. Svalina, Marital Property Law, § 28.05 (rev.2d ed. 1995). * * *."
{¶ 78} The Kansas Supreme Court offered the following detailed analysis of this topic in Davis, supra, 7 P.3d at 1232-1233, stating:
 {¶ 79} "Kansas courts have held that parties disclosing assets do not need to provide an exact dollar amount if there is a general knowledge of the nature and extent of the property involved. 1 Elrod and Buchele, Kansas Family Law § 2.31(3), p. 104. See also Johntz, Premarital Nonmarital Contracts in Practitioner's Guide to Kansas Family Law § 13.10 n. 56 (Leben ed. 1997) (noting that Kansas courts have upheld marital agreements where there is general knowledge of the assets of each party but where there may not be actual knowledge of the "exact dollar amount"). Professor Homer Clark, Jr., states in his article on marital contracts:
 {¶ 80} "`Where the wife is fully advised of her rights and of the effect upon them of the antenuptial agreement, or where she is experienced in business and accustomed to handling her own financial affairs, the agreement should be upheld even though the details of the husband's finances are not disclosed to her. In such a case it is sufficient that she knows her husband is rich, even though she does not know the exact extent of his wealth.'"
{¶ 81} "* * *
 {¶ 82} "See also Adams, 240 Kan. at 320
(holding that there had been adequate disclosure where wife had been `advised generally of the nature and extent' of her husband's assets and knew he was a multimillionaire where wife knew husband more than 20 years before signing agreement); In re Estate of Broadie, 208 Kan. 621, 627, 493 P.2d 289 (1972) (holding that the husband did not need to give a detailed disclosure of his property where his wife had a `general knowledge of the nature and extent' of his property interests); In re Estate of West, 194 Kan. 736, 745-46, 402 P.2d 117 (1965) (upholding marital agreement where party knew that future husband was wealthy but did not know the extent of his wealth, nor did she know the particular property interests held by him); In re Estate of Ward, 178 Kan. 366, Syl. P 1, 371, 285 P.2d 1081 (1955) (holding that husband did not need to `disclose in detail' the nature, extent and value of his property to his wife prior to her signing the antenuptial contract where she knew that he was a `man of some means' and that husband had not fraudulently concealed his assets); In re Estate of Schippel, 169 Kan. 151, 165, 218 P.2d 192 (1950) (husband does not need to give a detailed disclosure of his assets where his wife has a `general understanding' of the nature and extent of his property).
 {¶ 83} "Other courts have similarly held. See Hartz v. Hartz, 248 Md. 47, 51, 234 A.2d 865 (1967) (upholding premarital agreement where plaintiff knew more or less what property her fiance had and that he was very wealthy although she did not know in detail his financial position); Schutterle v. Schutterle, 260 N.W.2d 341, 349 (S.D. 1977) (upholding postnuptial agreement where wife had `sufficient knowledge of the nature and extent' of husband's property); In re Borton's Estate, 393 P.2d 808, 814 (Wyo. 1964) (upholding premarital agreement where party knew that fiance had a `goodly amount in the bank' and that he was `well to do' although she did not know exactly how much wealth he had until after he died)." (Emphasis added.)
{¶ 84} We are persuaded by the analysis contained in these cases, and, absent any authority to the contrary, today we adopt this line of reasoning and conclude that the full disclose requirement set forth in Gross is satisfied if the spouse challenging a prenuptial agreement has a general knowledge of the nature and extent of the other's wealth and assets. In this case, the record demonstrates that, at the time she signed the agreement, Dianne had a general knowledge of the nature and extent of Norman's wealth. She does not dispute that she knew Norman to be a man of exceptional means and that he disclosed over $28 million in assets in the prenuptial agreement. She had lived and worked for him for six years prior to their marriage and further worked as an office manager of the company which managed his holdings. As such, she has failed to demonstrate his lack of full disclosure or her lack of general knowledge of the nature, value and extent of his holdings.
{¶ 85} Based on these facts, Dianne's reliance on our decision in Parr v. Parr (Mar. 6, 1997), Cuyahoga App. No. 70300, is misplaced. InParr, we concluded that, based on the wife's testimony that she did not know the value of any of her husband's assets at the time she married him, the trial court did not err in finding the antenuptial agreement void and unenforceable. Unlike Parr, Dianne had a general knowledge of Norman's wealth before she signed the agreement, and, as such, Parr is inapposite to this case.
{¶ 86} Regarding the third prong of Gross, the Ohio Supreme Court has recognized that "these types of agreements tend to promote or facilitate marriage, rather than encourage divorce." Here, there is nothing in the record to support the conclusion that this prenuptial agreement promoted or encouraged divorce or profiteering by divorce. In fact, if anything, the opposite is true in this case: Norman testified that he would not have married Dianne without a prenuptial agreement, and therefore the agreement facilitated their marriage; further, the terms of the prenuptial agreement would not have encouraged Dianne to get a divorce and in fact prevented her from profiteering from this decision.
{¶ 87} Finally, the focal point of Dianne's appeal centers on her argument that, after a 25-year relationship and a 19-year marriage with two children, it is inequitable for her to receive only 1% of her ex-husband's assets. While we recognize that the terms of the prenuptial agreement disproportionately favor distribution of assets to Norman, contrary to statutory authority which would provide for a more equitable distribution based on the length of their marriage and the extent of his wealth, we are also cognizant that virtually every prenuptial agreement provides for the disproportionate distribution of assets in favor of the spouse who brings those assets to the marriage. This is the very purpose of a prenuptial agreement to avoid by contract the equitable distribution of property mandated by statute. Therefore, while we understand this argument, it is not well taken.
{¶ 88} Based on the foregoing, the trial court properly found the prenuptial agreement to be valid, a decision which is supported by competent, credible evidence. Accordingly, we reject this assignment of error.
{¶ 89} In her second assignment of error, Dianne challenges the division of property in the final judgment and divorce degree:
 {¶ 90} "THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN ITS DIVISION OF PROPERTY."
{¶ 91} Relying in part on R.C. 3105.171, Dianne argues the court abused its discretion in its division of property, claiming that the appreciation of Norman's separate property during their marriage constituted marital property. Norman and the Trusts counter that, according to the terms of the prenuptial agreement, this appreciation is his separate property.
{¶ 92} In this regard, R.C. 3105.171(A)(3) defines "marital property" to include the following:
 {¶ 93} "(3)(a) `Marital property' means, subject to division (A)(3)(b) of this section, all of the following:
{¶ 94} "* * *
 {¶ 95} (iii) Except as otherwise provided in this section, all income and appreciation on separate property, due to the labor, monetary, or in-kind contribution of either or both of the spouses that occurred during the marriage;
 {¶ 96} "(b) `Marital property' does not include any separate property." (Emphasis added.)
{¶ 97} R.C. 3105.171(A)(6)(a)(v) defines "separate property" to include: "Any real or personal property or interest in real or personal property that is excluded by a valid antenuptial agreement."
{¶ 98} Thus, income and appreciation on separate property during the marriage is generally regarded as marital property; however, such appreciation can be excluded by a valid prenuptial agreement. See Radcliffe v. Radcliffe (Apr. 27, 1994), Montgomery App. No. 14130. Dianne recognizes the import of this analysis but argues that "the prenuptial agreement does not deal with appreciation on separate property." Norman and the Trusts disagree and point to the following paragraphs of the prenuptial agreement:
 {¶ 99} "2. All property owned by each of them at the time of their marriage and all property acquired by each of them from their separate funds an property during the marriage, shall be their respective, separate property, and that neither of them shall have any right, interest or claim in and to the property of the other, except as provided in this agreement.
{¶ 100} "* * *
 {¶ 101} "14. Each party renounces and waives the provisions of all present and future statutes, laws and rules and any and all rights and interests in or to any property now owned by the other party or owned or acquired by the other party during the marriage, as well as any rights and interest in or to any of the income, profits and gains therefrom, * * *." (Emphasis added.)
{¶ 102} We agree with Dianne's assertion that paragraph 14 of the prenuptial agreement only applies in the event that the couple would reside in a community property state; nevertheless, we glean from the language of that paragraph the intent of the parties to reserve as their own separate property any income, profits and gains therefrom. This language, when read in pari materia with paragraph 2 of the prenuptial agreement, fortifies our conclusion that the parties intended any appreciation from separate property to remain separate property and not become marital property.
{¶ 103} After reviewing these provisions, we conclude the parties intended to exclude from marital property the appreciation of separate property in the prenuptial agreement. Our decision is in accord with the Second Appellate District's analysis in Radcliffe, supra, where the court stated:
 {¶ 104} * * * However, it appears to this court more likely that the parties intended that any appreciation on the appellant's marital [home] would adhere to that property, rather than that such appreciation would be itself treated as a property obtained during the parties' marriage. * * *
{¶ 105} Specifically, Dianne claims entitlement to the following:
 The 1996 federal tax refund.
{¶ 106} Dianne claims entitlement to one-half of the 1996 income tax refund because the couple filed jointly; however, the evidence presented at trial demonstrates that Norman paid the couple's taxes during the marriage, including the $1,464,354 overpayment in 1996, from his separate property. As referenced above, paragraph 2 of the prenuptial agreement states that property acquired by each from separate funds shall be their separate property. Thus, although the parties filed a joint tax return, the funds came from Norman's separate property and therefore were properly returned to him.
 The marital home.
{¶ 107} In accordance with the prenuptial agreement, Dianne is entitled to ownership of the marital home. The court awarded her the marital home, and the parties do not contest that award.
 The Hunting Valley lots.
{¶ 108} The trial court ordered Norman to pay Dianne $450,000 for her one-half of the value of three lots she and her ex-husband jointly owned in Hunting Valley, and ordered her to quit claim her interest in the lots to him. Dianne seeks the entire $900,000 value of these lots. However, the trial court correctly determined these lots to be marital property as it found Norman expressed donative intent in that he originally planned to build the marital home on one of these lots and transferred the property into joint ownership when they were newly married.
{¶ 109} Pursuant to R.C. 3105.171(C), the equal division of marital property is preferred. That statute provides:
 {¶ 110} (C)(1) Except as provided in this division or division (E) of this section, the division of marital property shall be equal. If an equal division of marital property would be inequitable, the court shall not divide the marital property equally but instead shall divide it between the spouses in the manner the court determines equitable. In making a division of marital property, the court shall consider all relevant factors, including those set forth in division (F) of this section.
 {¶ 111} (2) Each spouse shall be considered to have contributed equally to the production and acquisition of marital property.
{¶ 112} The court found:
 {¶ 113} * * * There is no question that the funds used to purchase the Hunting Valley lots were his separate, premarital funds. The lots were transferred when the parties were newly married and the children were very young. This court finds that Defendant had the donative intent requisite for finding that the property is marital. Plaintiff is entitled to one-half (1/2) of the Hunting Valley lots. * * *
{¶ 114} Dianne has failed to demonstrate that the trial court's equal division of this property constituted an abuse of discretion.
 The Salomon Smith Barney account.
{¶ 115} The evidence at trial indicates that, in December 1996, Norman opened this account and contributed 100% of the funds into it. Dianne claims that it is marital property because her ex-husband maintained these funds in a joint account. In this regard, R.C. 3105.171(H) states:
 {¶ 116} Except as otherwise provided in this section, the holding of title to property by one spouse individually or by both spouses in a form of co-ownership does not determine whether the property is marital property or separate property.
{¶ 117} The analysis in Barkley v. Barkley (1997),119 Ohio App.3d 155, 694 N.E.2d 989, is instructive on this issue where the court stated:
 {¶ 118} We take this statute to be a legislative ratification of the flexible approach adopted by Kuehn, supra, and followed by the trial court here. Thus, we believe R.C. 3105.171(H) means that the form of title is relevant to, but not conclusive of, the classification of property being either marital or separate. In other words, property held jointly may ultimately be determined to be separate, (see Bower v. Bower (Mar. 3, 1995), Sandusky App. No. 5-94-14, unreported; Domrose v. Domrose (Sept. 16, 1994), Ottawa App. No. 93OT054, unreported; Irwin v. Irwin (May 11, 1993), Green App. No. 92-CA-54, unreported; Baker v. Baker (Feb. 10, 1993), Meigs App. No. 477, unreported; Anderson v. Anderson, supra,) * * * The effect of the statute is to negate the presumption of a gift, but not to preclude such a finding upon an appropriate factual context.
 {¶ 119} There is no dispute that the source of the money to buy the lots came from the husband's separate property. Accordingly, our inquiry focuses on whether the trial court was factually correct in finding the appellee lacked the requisite donative intent to transfer a present possessory interest in the lots to the appellant when he had her name placed on the deeds along with his.
{¶ 120} * * *
 {¶ 121} Obviously, it is difficult to determine a spouse's intent at a prior point in time based upon an expression of that intent which is given after a relationship has broken down. Notwithstanding this difficulty, such a decision is better left to the trier of fact, rather than a reviewing court. Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 80, 461 N.E.2d 1273.
{¶ 122} Here, the trial court made the following factual findings, which are supported by the record and are not disputed by Dianne:
 {¶ 123} * * * Plaintiff testified that she was concerned about her security and what had been provided for her and in response Defendant established this account. Plaintiff did not testify that Defendant told her that the funds deposited into the account were a gift to her, or that she could use the account as she pleased. Defendant testified that he never intended her to have a present possessory interest he established the account to provide for her if he became disabled. * * * The Court finds Defendant's testimony to be credible regarding this account and finds this account to be Defendant's separate property.
{¶ 124} The trial court did not abuse its discretion in its determination that Dianne failed to establish that her ex-husband intended the joint account to be a gift. With no evidence of donative intent, and because Norman provided 100% of the funds in this account from his separate property, the court did not abuse its discretion in awarding it to him.
 The Prudential retirement account.
{¶ 125} The evidence presented at trial demonstrates that the funds deposited in Norman's Prudential retirement account came from his separate property. As we have concluded supra, the prenuptial agreement specifically excludes income, profits and gains from separate property. Accordingly, the trial court properly awarded these funds to Norman.
 The Willo Wood Company.
{¶ 126} The trial court found the interest in the Willo Wood Company to be Norman's separate property, stating:
 {¶ 127} * * * Plaintiff asserts that she owns a 5% interest in the partnership, but she did not know this until she saw it on her tax return. Defendant testified that Plaintiff was named as partner only to maintain the partnership status when his initial partner relinquished his interest. Defendant did not seek a capital contribution from Plaintiff to purchase her share and did not deliver any document to her showing a transfer of an interest in Willowood. The Court finds Defendant did not have the donative intent requisite for a finding that the property is marital. Willowood is Defendant's separate property. * * *
{¶ 128} The court's findings are supported by the record. Because the evidence shows that Norman contributed 100% of the funds to Willo Wood Company, and because there is no evidence that he intended the 5% transfer to be a gift, we cannot say the court abused its discretion in finding it to be his separate property.
 One-half of Norman Millstein's assets.
{¶ 129} Dianne maintains that Norman's considerable net worth, in excess of $120 million, should be subject to an equitable distribution, entitling her to one-half of these assets. She maintains that it is inequitable for her to only receive approximately 1% of Norman's wealth.
{¶ 130} While her position as a general statement of law is correct, as we discussed supra, the equitable distribution of marital property under R.C. 3105.171(C) does not include separate property excluded by a valid prenuptial agreement. See R.C. 3105.171(A)(6)(a)(v). In this case, the assets which Dianne seeks to obtain either are, or have been, derived from Norman's separate property; because we have already found the division of property in the prenuptial agreement to be valid, she has no legal right to these assets, and her claim in this regard is not well taken.
{¶ 131} Based on the foregoing, we have determined that the trial court properly exercised its discretion in the division of marital property. Accordingly, this assignment of error is overruled.
{¶ 132} As for the third assignment of error in this appeal, Dianne asserts:
 {¶ 133} THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN FAILING TO AWARD APPELLANT SPOUSAL SUPPORT THAT WAS REASONABLE AND APPROPRIATE.
{¶ 134} Dianne argues that the court abused its discretion in awarding spousal support in the amount of $3,000/month until June 2002, and $9,000/month thereafter, because it erroneously applied the need standard in Kunkle v. Kunkle (1990), 51 Ohio St.3d 64, 554 N.E.2d 83, which has been statutorily replaced by a reasonable and appropriate standard. She maintains that $9,000/month in spousal support is not reasonable or appropriate because it is less than 1% of her ex-husband's cash flow, contending that the court should have ordered a gross payment of support because her ex-husband has tried to avoid his support responsibilities by creating a trust.
{¶ 135} Norman and the Trusts assert that the spousal support award is reasonable and appropriate, pointing out that the court carefully considered each of the R.C. 3105.18(C)(1) factors and noting that the family budget during marriage never exceeded $10,000 per month.
{¶ 136} R.C. 3105.18(C)(1) mandates that a court consider all the following factors in determining whether spousal support is reasonable and appropriate:
 {¶ 137} (a) The income of the parties, from all sources, including, but not limited to, income derived from property divided, disbursed, or distributed under section 3105.171 [3105.17.1] of the Revised Code;
 {¶ 138} (b) The relative earning abilities of the parties;
 {¶ 139} (c) The ages and the physical, mental, and emotional conditions of the parties;
{¶ 140} (d) The retirement benefits of the parties;
{¶ 141} (e) The duration of the marriage;
 {¶ 142} (f) The extent to which it would be inappropriate for a party, because he will be custodian of a minor child of the marriage, to seek employment outside the home;
 {¶ 143} (g) The standard of living of the parties established during the marriage;
 {¶ 144} (h) The relative extent of education of the parties;
 {¶ 145} (i) The relative assets and liabilities of the parties, including but not limited to any court-ordered payments by the parties;
 {¶ 146} (j) The contribution of each party to the education, training, or earning ability of the other party, including, but not limited to, any party's contribution to the acquisition of a professional degree of the other party;
 {¶ 147} (k) The time and expense necessary for the spouse who is seeking spousal support to acquire education, training or job experience so that the spouse will be qualified to obtain appropriate employment, provided the education, training, or job experience, and employment is, in fact, sought;
 {¶ 148} (l) The tax consequences, for each party, of an award of spousal support;
 {¶ 149} (m) The lost income production capacity of either party that resulted from that party's marital responsibilities;
 {¶ 150} (n) Any other factor that the court expressly finds to be relevant and equitable.
{¶ 151} The trial court enjoys broad discretion in awarding spousal support, and we will not reverse such a decision absent an unreasonable, arbitrary, or unconscionable attitude exhibited by the court. See, e.g., Macko v. Macko (Feb. 26, 1998), Cuyahoga App. No. 72339, citing Babka v. Babka (1992), 83 Ohio App.3d 428, 432,615 N.E.2d 247, citing Blakemore v. Blakemore (1983), 5 Ohio St.3d 217,218, 450 N.E.2d 1140, 1141; Cherry v. Cherry (1981), 66 Ohio St.2d 348,421 N.E.2d 1293, paragraph two of the syllabus.
{¶ 152} Further, in McConnell v. McConnell (Feb. 3, 2000), Cuyahoga App. No. 74974, we recognized:
 {¶ 153} After Kunkle, the General Assembly redefined R.C. 3105.18 (C) (1) to include the appropriate and reasonable standard. Suggesting at least that the need factor is not the only barometer in which a trial court may be guided to award spousal support.
{¶ 154} Here, a review of the judgment entry reveals that the court did not base spousal support solely on Dianne's needs; rather, the court's entry specifies that it reviewed each of the R.C. 3105.18(C)(1) appropriate and reasonable factors:
 {¶ 155} Each of the factors set forth in Ohio Revised Code S3105.18 have been considered by this Court in arriving at a reasonable and appropriate amount of spousal support. Clearly, Defendant has the assets to pay whatever amount of support this Court deems reasonable and appropriate. Sustenance alimony is based on need. Kunkle v. Kunkle 51 Ohio St.3d 64
(1990) 70. In essence, when a sustenance award is not limited to the payee's need, the award has the effect of punishing the payor and rewarding the payee. Kinkle at 64. A spouse is not entitled, as a matter of law, to continue the luxurious lifestyle lived during the marriage. Simoni v. Simoni (1955), 102 Ohio App.3d 628.
 {¶ 156} Pursuant to Ohio Revised Code [S3105.18(C)(1)], the Court is mandated to consider:
 {¶ 157} (a) The income of the parties, from all sources, including, but not limited to, income derived from property divided, disbursed, or distributed under S3105.171 of the Revised Code;
 {¶ 158} Defendant has access to the income earned by property included in the MFGT. Plaintiff's income is minimal from her stocks and bonds. With reasonable effort on her part, Plaintiff should be able to invest the income received in this Court's property division to provide a steady stream of income from which she can become self supporting.
 {¶ 159} (b) The relative earning abilities of the parties;
 {¶ 160} Plaintiff has not worked since the marriage. Prior to that she worked for Defendant managing one of his properties in Las Vegas. Her income was less than $10,000.00. Defendant listed his occupation as management of real estate. His history indicates an ability to earn millions.
 {¶ 161} (c) The ages and physical, mental, and emotional conditions of the parties;
 {¶ 162} Plaintiff is 49 years of age. Defendant is 72 years of age. Both are in good physical, mental and emotional health. Because of the age difference, the spousal support order shall be binding on Defendant's estate.
{¶ 163} (d) The retirement benefits of the parties;
 {¶ 164} Plaintiff has no retirement benefits. Defendant has a Prudential Retirement account #AH-814516.
{¶ 165} (e) The duration of the marriage;
 {¶ 166} Defendant argues for a defacto termination date. Because of the protracted nature of this litigation, the Court finds the date of trial to be a more equitable date.
 {¶ 167} (f) The extent to which it would be inappropriate for a party, because he will be custodian of a minor child of the marriage, to seek employment outside the home;
 {¶ 168} The parties entered into a shared parenting agreement, whereby Plaintiff is the residential parent of Alana (age 17) for school purposes, and Defendant is residential parent of Joshua (age 15) for school purposes.
 {¶ 169} (g) The standard of living of the parties established during the marriage;
 {¶ 170} Plaintiff testified that Defendant was stingy with her during the marriage. Defendant testified that he never spent $20,000.00 per month. Defendant originally gave his wife a monthly budget of $6,000.00 per month, increased it to $8,000.00 per month, and just prior to Plaintiff's filing for divorce, it increased to $10,000.00 per month. (Transcript of April 4, 2000 at Page 176, Transcript of March 16, 2000 at Page 85-90.) Plaintiff paid all family expenses, including rent, utilities, and medical from this monthly budget. Plaintiff has been receiving $3,000.00 per month in spousal support and $7,900.00 in child support of which $2,000.00 goes into a dedicated account for the children. Thus, the amount available to her for living expenses has been $9,000.00 per month.
 {¶ 171} (h) The relative extent of education of the parties;
{¶ 172} Both parties are high school graduates.
 {¶ 173} (i) The relative assets and liabilities of the parties, including but not limited to any court-ordered payments by the parties;
 {¶ 174} According to Plaintiff's pretrial statement (Plaintiff's Exhibit 77), she has stocks valued at $200,000.00, a checking account with $3,900.00, 1994 Mercedes and a 1996 Chrysler van. Plaintiff lists her total monthly expenses to be $45,877.00. Defendant's monthly expenses total $7,862.00. According to his pretrial statement, his assets are a 1992 Lexus, a 1988 Chrysler, State of Israel Bonds valued at $56,000.00, Soloman Smith Barney account with a value of $1,887.00, Prudential Security account valued at $558,151.00, a business interest in Metro City I and II and Painesville Investment.
 {¶ 175} (j) The contribution of each party to the education, training, or earning ability of the other party, including, but not limited to, any party's contribution to the acquisition of a professional degree of the other party;
 {¶ 176} No evidence was presented as to this factor.
 {¶ 177} (k) The time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided the education, training or job experience, and employment is, in fact, sought;
 {¶ 178} No evidence was presented as to this factor.
 {¶ 179} (l) The tax consequences, for each party, of an award of spousal support;
 {¶ 180} No evidence was presented as to this factor.
 {¶ 181} (m) The lost income production capacity of either party that resulted from that party's marital responsibilities;
 {¶ 182} Prior to the marriage, Plaintiff was a licensed real estate agent. Although no evidence was presented as to her lost income capacity, the Court finds Plaintiff's earning ability to be marginal.
 {¶ 183} (n) Any other factor that the Court expressly finds to be relevant and equitable.
 {¶ 184} Pursuant to the terms of the antenuptial agreement, Plaintiff agreed to a sum of $3,000.00 per month in spousal support.
 {¶ 185} Based on the foregoing, the Court finds that spousal support [in the amount of $9,000] is reasonable and appropriate.
{¶ 186} Dianne now claims that her spousal support award of $9,000 is not appropriate or reasonable because it is less than 1% of her ex-husband's current cash flow. However, the income of the parties is only one factor to weigh under R.C. 3105.18(C)(1). Another factor, which supports the trial court's spousal support determination, is the standard of living of the parties established during the marriage. See R.C.3105.18(C)(1)(g).
{¶ 187} Here, Dianne acknowledged at trial that the family budget during the marriage never exceeded $10,000/month. This amount covered all household expenses for the entire family, including travel, taxes and insurance, and it also enabled her to pay her mother's rent and her mother's health insurance expenses.
{¶ 188} After considering the evidence and the applicable statutes, the court awarded Dianne spousal support of $3,000/month and child support of $7,900/month for Alana. Upon Alana reaching majority, the court order provides for an increase in spousal support to $9,000 per month. This amount, $9,000 a month to support just Dianne, is appropriate and reasonable in comparison to the $10,000 monthly budget for a family of four during the marriage.
{¶ 189} Dianne also maintains that the court should have awarded her spousal support because her ex-husband created a trust to avoid his responsibility to her. R.C. 3105.18(B) provides that an award of spousal support may be payable either in gross or by installments, as the court considers equitable. As discussed above, because the court's award of spousal support is appropriate and reasonable, it properly exercised its discretion in awarding spousal support. Accordingly, we reject this assignment of error.
{¶ 190} The fourth assignment of error raised by Dianne in App. No. 80188 states:
 {¶ 191} THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN DELAYING THE ISSUANCE OF ITS FINAL JUDGMENT ENTRY OF DIVORCE FOR SEVENTEEN MONTHS.
{¶ 192} Dianne complains that the trial court did not issue its final judgment in this case until 17 months after the conclusion of trial. She cites to Form B of the Rules of Superintendence, which suggests that divorce cases with children should be concluded within 18 months of the filing of a complaint. She notes that she filed for divorce on March 3, 1998, but the court did not issue its final judgment until August 13, 2001.
{¶ 193} Norman responds that numerous post-trial motions and extensions of time requested by both parties, including Dianne, justify post-trial delay. The Trusts assert that, based on the voluminous nature of this case, the court acted reasonably in taking additional time; they further argue that Dianne has not demonstrated any prejudice by the delay.
{¶ 194} We note that Form B is a statistical reporting form, not a rule, and it merely suggests guidelines on processing cases. Further, it is our opinion that the domestic court is better suited to police its own docket.
{¶ 195} Further, examination of the docket here reflects 256 filings in this case within the first 18 months, making it difficult, if not impossible, for the trial court to enter a final decree of divorce within 18 months of commencement as suggested by Form B. Thereafter, the parties, including Dianne, continued to litigate this case through the six-day prenuptial proceedings and then a 23-day trial, producing volumes of transcripts and extensive exhibits for the trial court to review.
{¶ 196} Subsequent to trial, the court issued its May 8, 2000 order involving the $72,000 Ohio tax credit. Thereafter, Dianne requested and obtained leave to further brief the issues raised at trial.
{¶ 197} Subsequently, on October 31, November 15, and December 13, 2000, the court issued the sua sponte orders involving Joshua. Additionally, Dianne filed several other appeals, not currently before us, which necessitated the delivery of the physical file to our court. Following return of this file to the domestic relations court, the court entertained the issues involving modification of child support, issuing its April 26, 2001 and May 15, 2001 orders.
{¶ 198} The complex and contentious nature of this action explains why the court required more than 18 months to process this case. Accordingly, this assignment of error is rejected.
{¶ 199} The fifth assignment of error in App. No. 80188 states:
 {¶ 200} THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN FAILING TO AWARD ADEQUATE INTERIM SPOUSAL AND CHILD SUPPORT AND IN ITS DESIGNATION OF AN INCOME SOURCE FOR THE PAYMENT OF SAID TEMPORARY SUPPORT.
{¶ 201} Dianne here challenges the adequacy of the temporary support order. However, she failed to offer any legal authority to support this proposition as required by App.R. 16(A)(7). Accordingly, pursuant to App.R. 12(A)(2), we summarily overrule this assignment of error.
 APPEAL NO. 80963 (Post-Decree Temporary Restraining Order)
{¶ 202} In her final appeal, Dianne asserts error in the court's denial of her motion to vacate the temporary restraining order, issued on December 4, 2001, regarding Joshua's school enrollment; she assigns the following error:
 {¶ 203} THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN FAILING TO VACATE THE ORDER OF DECEMBER 4, 2001.
{¶ 204} Dianne argues that the temporary restraining order should be vacated because Norman served his motion at her old address, and she further argues that the T.R.O. violated the general prohibition against ex parte orders, found in Dom.R.Loc.R. 2(E)(3) and 17(A).
{¶ 205} Initially, we note that, although the Local Rules generally disfavor ex parte orders, Dom.R.Loc.R. 24 specifically allows for ex parte temporary restraining orders; that rule states in part, * * * Restraining orders will be granted on an ex parte basis * * *. Therefore, Dianne's argument to the contrary is rejected, and the determinative issue is whether Dianne is entitled to relief from the T.R.O., pursuant to Civ.R. 60(B), based on Norman's failure to serve his motion on her at her then current address.
{¶ 206} In GTE Automatic Electric, Inc. v. ARC Industries, Inc. (1976), 47 Ohio St.2d 146, 351 N.E.2d 113, the court set forth in its syllabus the following test for relief from judgment:
 {¶ 207} 2. To prevail on a motion brought under Civ.R. 60(B), the movant must demonstrate that: (1) the party has a meritorious defense or claim to present if relief is granted; (2) the party is entitled to relief under one of the grounds stated in Civ.R. 60(B)(1) through (5); and (3) the motion is made within a reasonable time, and, where the grounds of relief are Civ.R. 60(B)(1), (2) or (3), not more than one year after the judgment, order or proceeding was entered or taken.
{¶ 208} Here, assuming Dianne is entitled to relief under one of the five grounds listed in Civ.R. 60(B), and assuming her motion is timely, her motion still fails because she has not demonstrated that she has a meritorious claim or defense to present if relief were to be granted. Simply stated, the court's temporary restraining order does not alter the parenting plan, which named Norman as the residential parent of Joshua for school enrollment purposes, but merely continued its August 18, 2001 order in that regard and restrained her from preventing enrollment in the CEDU program, removing Joshua therefrom or interfering with his attendance. Accordingly, this assignment of error is not well taken.
 The Cross-Appeals
{¶ 209} In his cross-appeal, Norman raises three cross-assignments of error for our review. They state:
 {¶ 210} THE TRIAL COURT ERRED IN ITS FINDING THAT NORMAN MILLSTEIN HAS ACCESS TO THE INCOME EARNED BY PROPERTY INCLUDED IN THE MFGT. (MILLSTEIN FAMILY GIFT TRUST).
 {¶ 211} THE TRIAL COURT ERRED IN ITS FINDING THAT DEFENDANT NORMAN MILLSTEIN IS ENTITLED TO RECEIVE INCOME FROM THE TRUST AND THAT THE INCOME FROM THE MFGT IS AVAILABLE TO DEFENDANT NORMAN MILLSTEIN.
 {¶ 212} THE TRIAL COURT ERRED IN FINDING THAT THE DEFINITION OF GROSS INCOME UNDER THE CHILD SUPPORT STATUTE, O.R.C. SECTION 3113.215, WAS TO BE APPLIED TO THE FINDINGS TO BE MADE BY THE TRIAL COURT FOR ITS AWARD OF SPOUSAL SUPPORT UNDER O.R.C. SECTION 3105.18.
{¶ 213} Further, Kevan Millstein, individually and as trustee of the Millstein Family Gift Trust, the AL-JO Trust, and the Kevan Millstein Trust, raises four cross-assignments of error, which relate to the first and third assignments of error presented by Dianne Millstein in Appeal No. 80188. These cross-assignments state:
 {¶ 214} THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN ITS LEGAL CONCLUSION THAT DEFENDANT NORMAN MILLSTEIN HAS ACCESS TO THE INCOME EARNED BY PROPERTY IN THE MFGT (THE MILLSTEIN FAMILY GIFT TRUST).
 {¶ 215} THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN ITS LEGAL CONCLUSION THAT DEFENDANT NORMAN MILLSTEIN IS ENTITLED TO RECEIVE INCOME FROM THE TRUST AND THAT THE INCOME FROM THE MFGT IS AVAILABLE TO DEFENDANT NORMAN MILLSTEIN.
 {¶ 216} THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN ITS LEGAL CONCLUSION THAT THE DEFINITION OF GROSS INCOME UNDER THE CHILD SUPPORT STATUTE, O.R.C. SECTION 3113.215, WAS TO BE APPLIED TO THE FINDINGS TO BE MADE BY THE TRIAL COURT FOR ITS AWARD OF SPOUSAL SUPPORT UNDER O.R.C. SECTION 3105.18.
 {¶ 217} THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN ITS LEGAL CONCLUSION THAT PLAINTIFF'S EXPERT WITNESS'S ANALYSIS OF INCOME IS CONSISTENT WITH EITHER THE SPOUSAL SUPPORT STATUTE'S DEFINITION OF INCOME OR THE CHILD SUPPORT STATUTE'S DEFINITION OF INCOME.
{¶ 218} Based on our disposition of Dianne's appeals, the cross-appeals are moot. Accordingly, pursuant to App.R. 12(A)(1)(c), we decline to address them.
{¶ 219} The judgments entered by the trial court in Appeal Nos. 79617 and 79754 challenging the modification in child support following a change in custody are affirmed.
{¶ 220} The judgments in Appeal Nos. 80184, 80185, 80186, and 80187 regarding the custody and schooling of Joshua and the disposition of a state tax credit are all affirmed.
{¶ 221} The judgments in Appeal No. 80188 regarding the prenuptial agreement, division of property, and support are also affirmed.
Judgment affirmed.
It is ordered that appellees recover of appellant their costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
MICHAEL J. CORRIGAN, P.J., and JAMES J. SWEENEY, J., CONCUR.